**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Woody Hyatt McCORMICK, Jr., Defendant–Appellant.**

No. 94–50591.

United States Court of Appeals, Fifth Circuit.

May 24, 1995.

Scott Peterson (court-appointed), Waco, TX, for appellant.

Richard L. Durbin, Jr., James H. DeAtley, Acting U.S. Atty., San Antonio, TX, for appellee.

Before DAVIS and WIENER, Circuit Judges, and VANCE,* District Judge.

WIENER, Circuit Judge:

Defendant–Appellant Woody Hyatt McCormick, Jr. appeals the district court's decision to revoke his supervised release and sentence him to two additional years in prison based on its finding that he failed to comply with the terms of his supervised release. McCormick claims in particular that the district court violated his constitutional right to confront and cross-examine adverse witnesses by relying on hearsay as evidence that he possessed a controlled substance during his period of supervised release. We conclude that no such constitutional effrontery occurred, and affirm.

I

FACTS AND PROCEEDINGS

McCormick was convicted of three counts of distribution of amphetamine and was sentenced to twenty-seven months imprisonment, followed by five years supervised release (later reduced to three years). McCormick served the prison term and began his supervised release in April, 1994, under the

* District Judge of the Eastern District of Louisi-

supervision of Probation Officer Humberto Velasquez (Officer Velasquez).

In August of that year, Officer Velasquez filed a Petition on Supervised Release with the district court, alleging that McCormick (1) "failed to work regularly at a lawful occupation"; (2) "used and possessed Amphetamine during the term of his supervised release; in that on or about July 11, 1994, the defendant tested positive for Amphetamine"; and (3) "used and possessed Methamphetamine during the term of his supervised release; in that on or about July 11, 1994, the defendant tested positive for Methamphetamine." Officer Velasquez recommended that McCormick's supervised release be revoked and that he be resentenced.

One week later, the district court held a revocation hearing at which the government offered evidence to support Officer Velasquez' allegations. He was the only witness to testify in person at that hearing.

In his testimony, Officer Velasquez first addressed the allegation that McCormick had failed to maintain lawful employment, one of the conditions of his supervised release. He testified that McCormick's former employer reported that McCormick had been fired for inexplicably failing to appear for work one day. McCormick did not object to this testimony at trial and does not challenge it on appeal.

Officer Velasquez' attention then turned to events surrounding a urine specimen submitted by McCormick on July 11, 1994. Officer Velasquez discussed the training that he had received in obtaining urine specimens, and then addressed the chain of custody linking McCormick to a particular specimen that tested positive for both amphetamine and methamphetamine. In connection with that testimony, the government introduced into evidence a document from a testing facility, PharmChem Laboratories, Inc. (PharmChem), in which document the test results and laboratory analyses of McCormick's urine specimen were reported (the "PharmChem urinalysis report"). This report reveals that the urine specimen was from McCormick, that McCormick reported taking

ana, sitting by designation.

Advil and Tylenol prior to providing the specimen, and that the urine tested positive for both amphetamine and methamphetamine. After stating that he "acknowledg[ed] the current status of the law," McCormick nonetheless objected to the introduction of the document in evidence, arguing that it violated his Sixth Amendment right of confrontation. The district court overruled this objection.

Officer Velasquez next testified that, pursuant to his request, David W. Fretthold, the Director of Toxicology for PharmChem (Director Fretthold), submitted an affidavit describing PharmChem's general testing procedures and results specific to analyses conducted on McCormick's urine specimen. In that affidavit, Director Fretthold stated, in particular, that McCormick's urine sample was analyzed using two separate procedures and opined that "there is virtually no possibility that the 'positive' result could be produced by any other drug taken by the subject, or by some interfering substance in the urine, since any such interfering substance would have to influence both methods to generate a false positive result." The affidavit was received in evidence over McCormick's objection that it violated his right of confrontation.

Officer Velasquez next testified that after he told McCormick that his urine tested positive, McCormick denied using drugs and claimed that he had also used "Ventolin," an inhalant that had been prescribed for his daughter, and that this medication must have caused his urine to test positive for amphetamine and methamphetamine. Officer Velasquez stated that he contacted the laboratory and was informed, that like Advil and Tylenol, Ventolin could not cause urine to test positive for either amphetamine or methamphetamine. McCormick did not object to Officer Velasquez' testimony that he was told by laboratory personnel that Ventolin could not result in urine testing positive for amphetamine or methamphetamine.

Officer Velasquez' testimony then focused on events following McCormick's admission to a Veterans Administration Hospital (VA Hospital) on August 8, 1994, just two days before the Petition on Supervised Release was filed and only nine days before the district court held the revocation hearing. Officer Velasquez stated that the VA Hospital analyzed McCormick's urine, and that again his urine tested positive for amphetamine. Although Officer Velasquez claimed that he obtained the test results from hospital records on the morning of the revocation hearing, no documentation was offered into evidence. McCormick objected to that testimony by Officer Velasquez, arguing that it was inadmissible hearsay and that it violated his right of confrontation. Both objections were overruled.

To corroborate evidence of McCormick's possession of controlled substances, Officer Velasquez then testified regarding information he had obtained from a confidential informant (CI). According to Officer Velasquez, the CI reported having seen controlled substances in a toolbox in McCormick's garage and having watched McCormick use and deal in amphetamines and methamphetamines. The CI did not testify at the revocation proceeding, Officer Velasquez explained, because McCormick had recently threatened the CI with a firearm. The court overruled McCormick's objection that this testimony by Officer Velasquez was inadmissible hearsay.

Officer Velasquez concluded his testimony on redirect by describing a visit he had recently made to McCormick's home. Officer Velasquez stated that during that visit he saw a scale similar to the type used to weigh infants, and that after he noticed the scale the first thing McCormick said was that it "was not used for drugs." At this point, the government rested its case and stood on the record; the defense offered no evidence and waived argument.

Based on all of the evidence, the district court concluded that McCormick had committed all three violations alleged in the Petition on Supervised Release, revoked his release, and sentenced him to twenty-four months imprisonment. McCormick timely appealed, challenging on confrontation grounds the admission into evidence of the PharmChem urinalysis report and Officer Velasquez' hearsay testimony, and claiming that the district court reversibly erred in failing to make findings of fact on the record

concerning the reliability of the hearsay evidence.

## II

## ANALYSIS

### A. Grounds for Revocation

■ A district court may revoke a defendant's supervised release if it finds by a preponderance of the evidence that a condition of release has been violated.[1] We review for abuse of discretion a decision to revoke supervised release.[2]

■ McCormick failed to object at the revocation hearing to Officer Velasquez' testimony that he had been told by McCormick's employer that McCormick had been fired for failing to come to work. Neither does McCormick challenge the admissibility of that testimony on appeal. As maintaining employment was one of the conditions of McCormick's supervised release, and as McCormick does not challenge the district court's conclusion that he failed to comply with that requirement, the district court did not abuse its discretion in revoking McCormick's supervised release.[3]

### B. Grounds for Imposing Sentence

After revoking McCormick's release, the district court sentenced McCormick to twenty-four months in prison. Although the court did not expressly state on what grounds the sentence was calculated, we are entitled to assume, in light of guidance by the U.S. Sentencing Commission (Commission),[4] that the length of McCormick's sentence was determined based on findings that McCormick both failed to maintain employment and possessed a controlled substance while he was on supervised release.[5] As we have already determined that no error is presented in the court's ruling that McCormick did not remain employed, we must consider only whether the district court erred in finding that he used and possessed a controlled substance.

■ McCormick contends that the district court reversibly erred in failing to make findings of fact that the hearsay supporting the finding that he used and possessed a controlled substance was reliable; and that the court erred further when it admitted that hearsay without first weighing his right of confrontation against the government's reasons for not producing the hearsay declarants. McCormick insists that even if we were to conclude that those errors were not reversible, his right of confrontation was violated by the admission into evidence of (1) the PharmChem urinalysis report; (2) Officer Velasquez' testimony that tests conducted at the VA Hospital detected the presence of amphetamines; and (3) Officer Velasquez' testimony that he was told by the CI that she saw McCormick use and deal in narcotics. Alleged violations of the Confrontation Clause are reviewed de novo, but are subject to a harmless error analysis.[6]

---

1. *See* 18 U.S.C. § 3583(e)(3) (1988).

2. *United States v. Turner*, 741 F.2d 696, 698 (5th Cir.1984).

3. *Id.* ("'Where there is an adequate basis for the district court's discretionary action of revoking probation, the reviewing court need not decide a claim of error as to other grounds that had been advanced as a cause of revocation.'" (quotation omitted)); *see United States v. Irvin*, 820 F.2d 110, 111 (5th Cir.1987) ("All that is required for the revocation of probation is enough evidence to satisfy the district judge that the conduct of the petitioner has not met the conditions of probation.").

4. The Commission has promulgated policy statements in which it recommends specified periods of incarceration for particular classes of violations of supervised release. *See* U.S.S.G. §§ 7B1.1–7B1.5. The Commission recommends a range of imprisonment from 6–12 months for a Category IV offender, like McCormick, commits a Grade C violation, such as failure to maintain employment. *See id.* § 7B1.4(a).

5. If a releasee possesses a controlled substance during a period of supervised release, then the court is *required* to revoke supervised release and impose a prison term not less than one-third the term of the supervised release—in this case, not less than one year. 18 U.S.C. § 3583(g); *see United States v. Kindred*, 918 F.2d 485, 487 (5th Cir.1990).

6. *See United States v. Frazier*, 26 F.3d 110, 113 (11th Cir.1994) (finding harmless district court's error in failing to make findings on the record that hearsay was reliable or to weigh on the record defendant's right of confrontation against government's reasons for not producing witness);

1. *Failure To Make Explicit Findings: "A Stitch in Time ...."*

We first consider whether the district court reversibly erred in failing to make discrete findings of fact regarding the reliability of the hearsay evidence or in failing to conduct the requisite balancing on the record. Although we are disappointed by the district court's failure to heed both our and the Supreme Court's clear mandate to make appropriate findings on the record, we nevertheless cannot conclude that these omissions, in this particular case, constitute harmful error.[7]

In *United States v. Kindred,*[8] we noted that procedural due process requires that a district court render a written statement specifying the evidence on which it relies in revoking supervised release.[9] In that case, however, we also found that failing to provide such a statement can be harmless if the evidence presented at the proceeding overwhelmingly shows that the defendant had violated the conditions of his supervised release.[10]

In the instant case, the district court concluded that the government established the allegations in the Petition on Supervised Release, and the record makes clear what evidence the government proffered. Implicit in the district court's judgment, not to mention its rulings rejecting McCormick's objections, is its finding that the government's hearsay evidence is reliable.[11] Thus, like the court in *Kindred*, we find harmless the district court's otherwise reversible error in failing to identify specifically the item or items of the government's evidence on which the court relied.[12]

A court must expressly find that there is "good cause" to deny a defendant the right to confront and cross-examine an adverse witness in a parole revocation hearing.[13] McCormick claims that the district court reversibly erred in failing to make an explicit finding, on the record, that there was good cause for dispensing with confrontation during his hearing. We disagree.

The district court overruled McCormick when he objected on confrontation grounds to the admission of the PharmChem urinalysis report and to Officer Velasquez' testimony regarding the CI's observations and the results of the urinalysis conducted at the VA Hospital. Implicit in those rulings is the conclusion that the district court believed that the government established good cause to forego confrontation. Although in some

---

*see, e.g., Kindred*, 918 F.2d at 448 (holding remand unnecessary to obtain written statement specifying evidence upon which revocation was based as evidence overwhelmingly showed defendant possessed a controlled substance).

7. We take this opportunity to entreat the district courts of this circuit to discharge their obligation to make appropriate findings on the record whenever such findings are called for. By so doing, a district court can save significant judicial resources, as a complete record facilitates appellate review and decreases the likelihood that a matter will be remanded to conduct an evidentiary hearing and find facts that could have easily been found and recounted on the record the first time through. *See, e.g., United States v. O'Meara*, 33 F.3d 20 (8th Cir.1994) (per curiam). This opinion is a case in point. Had the district court favored us with record findings and conclusions such as, for example, whether it found Officer Velasquez to be a credible witness, whether it credited testimony that McCormick inhaled Ventolin before providing his specimen, or that good cause excused the CI from testifying, this case would likely have resulted in an easy affirmance, probably without the need for

an opinion beyond a simple affirmance consistent with 5th Circuit Rule 47.6.

8. 918 F.2d 485 (5th Cir.1990).

9. *Id.* at 488.

10. *Id.*

11. *See, e.g., United States v. Alaniz–Alaniz*, 38 F.3d 788, 791 n. 8 (5th Cir.1994) (stating that implicit in court's ruling that defendant violated conditions of supervised release was finding that hearsay testimony was sufficiently credible to support the government's charge), *cert. denied*, —— U.S. ——, 115 S.Ct. 1412, 131 L.Ed.2d 297 (1995).

12. *Kindred*, 918 F.2d at 488; *see also United States v. Copeland*, 20 F.3d 412, 414 (11th Cir. 1994) (stating that oral findings can satisfy *Morrissey* "when those findings create a record sufficiently complete to advise the parties and the reviewing court of the reasons for the revocation of supervised release and the evidence the decision maker relied upon").

13. *Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972).

cases the failure to make such a finding on the record can constitute reversible error that is not harmless,[14] the clarity of the testimony and the quality and extent of the documentary evidence in the instant case are sufficient to enable us to review the district court's implicit conclusions.[15] As such, we deem it unnecessary to remand to that court for it to make explicit that which is already implicit. Whether the naked record, absent such express findings, is sufficient to withstand scrutiny is another matter, to which we now advert our attention.

### 2. Right of Confrontation

■ In *Morrissey v. Brewer*,[16] the Supreme Court held that a defendant must receive a fair and meaningful opportunity to refute or impeach evidence against him "to assure that the finding of a parole violation will be based on verified facts."[17] That means, according to the Court, that among a defendant's rights in a parole-revocation hearing is "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)."[18] The due process requirements recognized in *Morrissey* are incorporated in Federal Rule of Criminal Procedure 32.1(a)(2), which is applicable to

supervised release revocation proceedings.[19] Therefore, "[t]he same protections granted those facing revocation of parole are required for those facing the revocation of supervised release."[20]

In determining whether to invoke the *Morrissey* "good cause" exception to a defendant's right of confrontation, courts are instructed to employ a balancing test in which they are to weigh "the [defendant's] interest in confronting a particular witness against the government's good cause for denying it, particularly focusing on the 'indicia of reliability' of a given hearsay statement."[21] We must now determine whether the government met its burden of showing that the good cause for pretermitting live testimony outweighed McCormick's right to confront the hearsay declarants.

#### a. PharmChem Urinalysis Report

■ McCormick complains that his right of confrontation was violated when he challenged the reliability of the PharmChem urinalysis test results but was not permitted to cross-examine the laboratory technicians who performed those tests. In particular, McCormick contends that he offered a reasonable explanation how his specimen could

14. *See, e.g., United States v. O'Meara*, 33 F.3d 20, 21 (8th Cir.1994) (per curiam). In *O'Meara*, the Eight Circuit ruled in a per curiam opinion that a district court reversibly erred in admitting challenged hearsay evidence without expressly engaging in the requisite balancing on the record. Unlike *O'Meara*, which concerned the admission of oral hearsay, the instant case involves the reliability of hearsay contained in a urinalysis report, which we have noted is "ordinarily more reliable than oral hearsay statements." *Kindred*, 918 F.2d at 487 n. 2. We further infer from the *O'Meara* opinion that the record in that case, unlike here, was insufficient to permit meaningful review by the appellate court, making remand necessary. Otherwise a remand would not have been necessary, as confrontation challenges are subject to harmless error analysis. *See United States v. Frazier*, 26 F.3d 110, 113 (11th Cir. 1994); *Kindred*, 918 F.2d at 488.

15. *See, e.g., Alaniz–Alaniz*, 38 F.3d at 791 n. 8 (finding harmless district court's error in failing explicitly to engage in balancing test); *United States v. Bell*, 785 F.2d 640, 643 n. 3 (8th Cir. 1986) (stating that, although district court did not make explicit finding of "good cause" to dispense with confrontation, such finding was

implicit in decision overruling releasee's objections, and record was "sufficiently clear to enable us to review the district court's implicit findings," making remand unnecessary); *see also Kindred*, 918 F.2d at 488 (requiring no remand where evidence "overwhelmingly showed" releasee possessed controlled substance).

16. 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

17. *Id.* at 484, 92 S.Ct. at 2601–02.

18. *Id.* at 489, 92 S.Ct. at 2604. In *Gagnon v. Scarpelli*, 411 U.S. 778, 782, 93 S.Ct. 1756, 1759–60, 36 L.Ed.2d 656 (1973), the Court extended those same rights to probationers.

19. Fed.R.Crim.P. 32.1(a)(2).

20. *United States v. Copeland*, 20 F.3d 412, 414 (11th Cir.1994).

21. *United States v. Kindred*, 918 F.2d 485, 486 (5th Cir.1990) (quoting *Farrish v. Mississippi State Parole Bd.*, 836 F.2d 969, 978 (5th Cir. 1988)).

222

have tested positive for amphetamines and methamphetamines without his having ingested those narcotics; and that his right of confrontation was infringed when he was denied the opportunity to cross-examine the technicians regarding his theory. We are not convinced, however, that under the totality of the circumstances McCormick's interest in confronting those witnesses is sufficient to overcome the government's good cause for denying confrontation.

### i. McCormick's Interest

The laboratory results were obviously important to the district court's finding that the releasee possessed a controlled substance: McCormick denied using narcotics, and the PharmChem urinalysis report is the most reliable evidence that, to the contrary, he did use drugs.[22] The significance of those test results is magnified further by the fact that a finding of McCormick's use and possession of narcotics triggered application of the mandatory minimum sentence specified in 18 U.S.C. § 3583(g).[23]

Still, we find minimal McCormick's interest in confronting the technicians who conducted the tests. In *United States v. Pierre*,[24] Judge Easterbrook recently reasoned in another context, but in words equally applicable here:

What was the technician going to say on the stand? One vial of urine looks like another; the technicians would not have remembered what they did with [the releasee's] specimens and therefore would have described their normal procedures, and the judge would not have been enlightened.[25]

Continuing, Judge Easterbrook noted that "[a] court cannot resolve scientific controversies by looking witnesses in the eye; the question is not whether a technician believes the tests accurate but whether they *are* accurate."[26] Furthermore, "[t]o find out whether tests are accurate, one uses the methods of science."[27] It follows, therefore, that a releasee's interest in cross-examining a laboratory technician regarding a scientific fact is less than would be his interest, for example, in confronting a hearsay declarant regarding what that declarant may have seen. The truth of the former can be verified through methods of science; the truth of the latter can best be verified through the rigor of cross-examination, conducted under the circumspect eye of the district court. As McCormick is essentially contesting an issue of science, *i.e.*, whether a certain medication can produce a specific result during laboratory testing, his interest in confronting the technicians who conducted the tests is not substantial.

Moreover, denying McCormick the right to cross-examine the laboratory technicians did not significantly deny him the opportunity to impeach or refute the government's evidence of his possession. Innumerable avenues were available to McCormick to refute the government's proof; he merely failed to pursue them. For example, had McCormick wanted to question the technicians who performed the analyses, or even Director Fretthold, he could have sought a subpoena ordering their appearance.[28] But this he did not do. McCormick could also have requested that his specimen be retested by PharmChem or another laboratory.[29] But this he

22. *Id.* at 487 n. 2 ("Regular business reports, like the urinalysis tests, are ordinarily more reliable than oral hearsay statements.").

23. *See United States v. Martin*, 984 F.2d 308, 312 (9th Cir.1993) (noting that importance of urinalysis test results was increased due to consequences of finding that releasee possessed and used drugs).

24. 47 F.3d 241, 242 (7th Cir.1995).

25. *Id.* at 243.

26. *Id.* (emphasis in original).

27. *Id.*

28. *See id.; United States v. Siqueiros*, 21 F.3d 1118 (9th Cir.1994) (table opinion) (text available at 1994 WL 134527), *cert. denied,* — U.S. —, 115 S.Ct. 161, 130 L.Ed.2d 99 (1994).

29. It is PharmChem's policy to maintain positive specimens for at least three months, but there is no evidence in the record that McCormick requested, or that the district court denied a request, to have the specimen retested. *Compare United States v. Martin*, 984 F.2d 308, 312 (9th Cir.1993) (finding violation of confrontation rights where, inter alia, "court denied Martin the

did not do. He could have sought to obtain evidence impugning the reliability of the laboratory or its testing methods.[30] But this he did not do. Perhaps the avenue most likely to help the argument he pursued during the revocation hearing, McCormick could have introduced evidence to support his unsupported conclusionary contention that the presence of Advil, Tylenol, or Ventolin in his system could cause his specimen to test positive for the presence of amphetamines and methamphetamines.[31] But this too he did not do. In sum, McCormick had available a host of alternative ways to challenge the hearsay in the PharmChem urinalysis report, but he either did not seek or could not find the evidence to support those alternatives. In any event, however, the record makes clear that McCormick was not denied in any manner whatsoever the opportunity to rebut with his own proof the government's evidence of his possession and use of illegal narcotics.

This fact makes the instant case distinguishable from *United States v. Martin*,[32] another case in which a defendant argued that the admission into evidence of a PharmChem urinalysis report violated his right of confrontation. In that case, the Ninth Circuit found that a releasee was given virtually no opportunity to refute urinalysis results, as the government proffered no evidence regarding either the particular tests employed on the specimens or PharmChem's general

testing and handling procedures. Furthermore, the district court denied without explanation the defendant's request to allow an independent retesting of his specimens. Here, in stark contrast to the facts of *Martin*, the government offered the affidavit of Director Fretthold describing in detail PharmChem's general testing procedures and the results of the particular analyses conducted on McCormick's specimen, specifically refuting McCormick's allegation that a positive result could be produced by taking another medication.[33] More important, McCormick, unlike the defendant in *Martin*, was not refused any request to obtain evidence to refute the government's case—he simply made no effort to obtain such potentially exculpatory proof.[34] And, harking once more to Judge Easterbrook, we hear: "Judges rely on the self-interest of the parties to flag declarants to be unreliable, and they rely on their own skills to get at the truth." [35]

### ii. *Government's Good Cause*

 The reliability of the hearsay is an important consideration in determining whether sufficient good cause exists to forego confrontation.[36] We, like other courts, have consistently recognized that urinalysis reports bear substantial indicia of reliability,[37] as they " 'are the regular reports of a company whose business it is to conduct such tests, and which expects its clients to act on the

---

opportunity to retest the samples independently").

**30.** See *Pierre*, 47 F.3d at 243.

**31.** See generally *id.* at 242–43 (discussing types of evidence that defendant could have, but did not, adduce to "cross-examine" urinalysis reports).

**32.** 984 F.2d 308 (9th Cir.1993).

**33.** See *United States v. Siqueiros*, 21 F.3d 1118 (9th Cir.1994) (table opinion) (text available at 1994 WL 134527) (distinguishing *Martin* on similar grounds), *cert. denied*, —— U.S. ——, 115 S.Ct. 161, 130 L.Ed.2d 99 (1994).

**34.** Compare *Pierre*, 47 F.3d at 243 (noting that releasee "insisted that the prosecutor bore the entire burden, that by relying on written submissions the prosecutor had not shouldered the bur-

den, and that he [the releasee] therefore need not present any evidence").

**35.** *Id.* (quoting *United States v. Atkin*, 29 F.3d 267, 269 (7th Cir.1994)).

**36.** *United States v. Kindred*, 918 F.2d 485, 486 (5th Cir.1990) (noting that courts "particularly focus[ ] on the indicia of reliability" when assessing good cause to deny confrontation).

**37.** See, e.g., *Pierre*, 47 F.3d at 242 (stating urinalysis reports, as "written reports of medical tests," are "in the main reliable"); *United States v. Bell*, 785 F.2d 640, 643 (8th Cir.1986) (stating that "urinalysis laboratory reports bear substantial indicia of reliability. They are the regular reports of a company whose business it is to conduct such tests, and which expects its clients to act on the basis of its reports").

basis of its reports.' " [38] Still, they are not so inherently reliable as to be automatically admissible in any revocation hearing.[39]

In this case, however, the government proffered significant evidence demonstrating that the information reported in this particular PharmChem urinalysis report is extremely reliable. Officer Velasquez testified to his extensive training in obtaining urine specimens.[40] He described, step-by-step, the specimen's unbroken chain of custody, starting with McCormick and continuing until the specimen was mailed to PharmChem.

Director Fretthold picked up the story from there. In his affidavit, he described PharmChem's general procedures for receiving specimens through the mail and then ensuring the integrity of those specimens throughout the entire testing process.[41] He further explained, in detail, PharmChem's experience, its certifications, the various testing procedures that it employs, the reliability of those procedures, and the company's quality control measures. Next he discussed the records pertinent to McCormick's specimen. He stated that PharmChem's records indicate that the specimen had been tested using standard PharmChem procedures; that testing detected the presence of amphetamine; and that, as per PharmChem's standard procedures, the positive specimen was retested using a second methodology, which additional test confirmed the presence of amphetamine and methamphetamine.

Officer Velasquez' testimony and Director Fretthold's affidavit establish that this particular urinalysis report provided extremely reliable information regarding McCormick's possession of illegal narcotics. We note too that requiring laboratory technicians to appear in person at McCormick's parole revocation hearing would have incurred some difficulty and expense.[42]

Substantial evidence enhanced the reliability of the information contained in the PharmChem urinalysis report. We cannot fathom what additional, enlightening information the district court could have gleaned had McCormick been permitted to cross-examine the laboratory technicians. In light of the at-best marginal benefit to be gained by requiring those technicians to submit to cross-examination, the significant number of available but unavailed options to confront the urinalysis report, the reliability of this particular urinalysis report, and the difficulty and cost associated with requiring those technicians to appear at the hearing, we conclude that the record supports an implicit finding by the district court that the government showed good cause for denying McCormick's right to confront the laboratory technicians.

### b. Director Fretthold's Affidavit

■ Although McCormick does not specifically complain that he was denied an opportunity to confront Director Fretthold, we infer such a challenge from his contention that he should have been permitted to cross-examine laboratory "technicians." Further, as Director Fretthold's statements are the ones that unequivocally refute McCormick's "false positive" theory, we will interpret McCormick's argument broadly and consider whether the admission into evidence of Director Fretthold's affidavit infringed McCormick's right of confrontation.

### i. McCormick's Interest

We begin with the observation that Director Fretthold stated in his affidavit that "there is virtually no possibility that the 'positive' result could be produced by any other drug taken by the subject, or by some interfering substance in the urine, since any such

**38.** *United States v. Martin*, 984 F.2d 308, 314 (9th Cir.1993) (quoting *Bell*, 785 F.2d at 643).

**39.** *Id.* at 313.

**40.** *Compare id.* at 314 n. 10 (noting that probation officer had only three and one-half months experience obtaining specimens for urinalysis testing).

**41.** *Compare id.* at 313 (distinguishing *United States v. Burton*, 866 F.2d 1057, 1058 (8th Cir.),

*cert. denied*, 490 U.S. 1110, 109 S.Ct. 3167, 104 L.Ed.2d 1029 (1989), on basis that in that case "government supported urinalysis results with an affidavit from the director of the laboratory").

**42.** *See United States v. Kindred*, 918 F.2d 485, 486 n. 1 (5th Cir.1990) (quoting *Gagnon v. Scarpelli*, 411 U.S. 778, 783 n. 5, 93 S.Ct. 1756, 1760 n. 5, 36 L.Ed.2d 656 (1973)).

interfering substance would have to influence both methods to generate a false positive result." This statement completely debunks McCormick's "false positive" theory.

Had McCormick presented any evidence to support his theory, his interest in confronting Director Fretthold's statement might have had legal significance.[43] Indeed, the district court would then have had before it contradictory evidence whether those medications could cause a false result, making more important the issue of the credibility and knowledge of the witnesses who provided contradictory expert testimony. As it is, however, the only such evidence before the court was Director Fretthold's affidavit. Although his testimony is important to support a finding that the PharmChem urinalysis report is reliable, it is not necessary to contradict any exculpatory *evidence* proffered by McCormick. As Director Fretthold's affidavit was used in such a limited manner, we find McCormick's interest in confronting Fretthold analogous to—and no more important than—his interest in confronting any ordinary laboratory technician involved in testing the specimen.

### ii. *Government's Good Cause*

■ Turning to the government's good cause for denying McCormick an opportunity to confront Director Fretthold, we note at the outset that oral hearsay, such as that found in Director Fretthold's affidavit, is generally considered to be less reliable than a business record, such as the PharmChem urinalysis report.[44] Nonetheless, we discern in this particular affidavit significant indicia of reliability.

First, Director Fretthold submitted his oral hearsay under oath and penalty of perjury, thus making his statements more reliable than unsworn hearsay generally. Second, whether a given medication can cause a specimen to test positive for a given controlled substance is essentially a scientific fact which, as observed above, can be verified or refuted through scientific methods. We comfortably assume that a substantial laboratory of national prominence, which performs a significant volume of urinalyses for the government and relies substantially on such work for its economic viability, values its reputation for accuracy and expertise in the field—as would its director of toxicology. As we view Director Fretthold's testimony as tantamount to that of a "scientist" who is merely confirming under oath a scientific fact that is verifiable and within his area of expertise, we are satisfied that his testimony has significant indicia of reliability.

Furthermore, we believe that the government has good cause not to require a laboratory director, such as Director Fretthold, to testify in person in every proceeding in which a defendant baldly asserts, without presenting any supporting evidence whatsoever, that a positive urinalysis was or could have been caused by some medication that he was then taking. Such a requirement would likely be disruptive to the laboratory and costly to the government, yet add little if anything to the reliability of the test results in question.

In *Morrissey,* the Supreme Court urged courts to apply evidentiary rules flexibly in revocation hearings,[45] and in *Gagnon,* the Court explained further that, "[w]hile in some cases there is simply no alternative to live testimony, we emphasize that we did not in *Morrissey* intend to prohibit use where appropriate of the conventional substitutes

**43.** *See, e.g., United States v. Bell,* 785 F.2d 640, 643 n. 4 (8th Cir.1986) (finding no violation of right of confrontation where, inter alia, *"no evidence* was presented to contradict Bell's drug usage, and [Bell] made only general, unsubstantiated claims that the laboratory tests may have been defective" (emphasis added)); *United States v. Penn,* 721 F.2d 762, 766 (11th Cir.1983) (noting that Penn's confrontation rights were not infringed "[i]n the absence of any *evidence* tending to contradict Penn's drug usage or the accuracy of the tests" (emphasis added)); *see also*

*Kindred,* 918 F.2d at 487 (citing *Penn* with approval).

**44.** *Kindred,* 918 F.2d at 487 n. 2.

**45.** *Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972) (stating that "the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial").

for live testimony, including affidavits, depositions, and documentary evidence."[46] We deem entirely appropriate as a substitute for live testimony the government's use of documentary evidence such as the PharmChem urinalysis reports when, as here, the reliability of the information in the document is supported by both live and affidavit testimony. We further conclude that an affidavit of a laboratory director is also an appropriate substitute for his live testimony, especially when the purpose of that affidavit is merely to relate easily verifiable scientific information, such as that provided by Director Fretthold here.[47]

### 3. *Other Evidence*

 The combination of the undisputed proof of McCormick's work failure, the PharmChem urinalysis report, and Director Fretthold's affidavit, provide sufficient competent evidence from which a district court could reasonably conclude that McCormick violated the terms of his supervised release by failing to maintain employment and by unlawfully possessing and using a controlled substance, thereby requiring revocation of his supervised release and justifying his sentence.[48] It is therefore unnecessary for us to reach the issue whether the district court erred in admitting the additional evidence of McCormick's possession of narcotics.[49] Concluding for the foregoing reasons that the evidence which we here find to have been properly admitted was sufficiently reliable and probative—and at most harmlessly violative of McCormick's confrontation right—to support revocation of supervised release and imposition of an additional sentence of two

years, we affirm the judgment of the district court in all respects.

AFFIRMED.

---

46. *Gagnon v. Scarpelli*, 411 U.S. 778, 782 n. 5, 93 S.Ct. 1756, 1760 n. 5, 36 L.Ed.2d 656 (1973).

47. *See generally United States v. Pierre*, 47 F.3d 241, 243 (7th Cir.1995) ("A court cannot resolve scientific controversies by looking witnesses in the eye.... To find out whether tests are accurate, one uses the methods of science.").

48. *See Morrissey*, 408 U.S. at 484, 92 S.Ct. at 2601–02 (requiring evidence be sufficient to "assure that the finding of a parole violation [is] based on verified facts").

49. We are troubled by the district court's apparent admission of Officer Velasquez' testimony regarding the CI. Had that been the only evidence of McCormick's drug possession, we are confident that the district court would have erred in relying on it as competent evidence, *see Farrish v. Mississippi State Parole Bd.*, 836 F.2d 969 (5th Cir.1988), unless, of course, the court made a specific finding that good cause excused the CI from testifying, *see Morrissey*, 408 U.S. at 489, 92 S.Ct. at 2604.