# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 13, 2020

Lyle W. Cayce
Clerk

No. 19-10040
c/w No. 19-10041

Consolidated with 19-10041

UNITED STATES OF AMERICA,

　　　　Plaintiff – Appellee,

v.

RAMON ALVEAR,

　　　　Defendant – Appellant.

Appeals from the United States District Court
for the Northern District of Texas

Before HAYNES and OLDHAM, Circuit Judges, and HANEN, District Judge.[*]
PER CURIAM:

The district court revoked Ramon Alvear's supervised release and sentenced him to 27 months imprisonment. On appeal, Alvear argues that the district court violated his right to confront adverse witnesses by considering hearsay during his revocation hearing. On the facts of this case, we affirm.

I.

The United States prosecuted, convicted, and incarcerated Alvear for various drug crimes. The Bureau of Prisons released him, and he began serving

_____

[*] District Judge for the Southern District of Texas, sitting by designation.

his term of supervised release. But according to Alvear's probation officer, he violated the terms of that release by: (1) choking his wife, Lilia Alvarez, (2) failing to file a "truthful and complete written report" with his probation officer by falsely claiming that he lived with his mom, and (3) failing to inform his probation officer that he had, in fact, moved in with Alvarez.[1]

To support these allegations, the probation officer alleged the following facts. On March 19, 2018, Dallas police officers responded to a call from Alvarez's house. Alvarez told the officers that Alvear had choked her the night before. During the altercation, Alvear had told Alvarez, that "[i]t's not worth killing you. I'm not gonna get my hands dirty. I'll just get someone else to do it." An arrest warrant soon issued for Alvear for "Assault" of a "Family/Household Member" by "Imped[ing] Breath/Circulation," a third-degree felony in Texas. Alvarez also sought and obtained a temporary protective order against Alvear.

But this was not the only incident between Alvear and Alvarez. Several weeks prior to this altercation, Alvarez filed a different police report and alleged that Alvear was "making threats against her." She said Alvear told her that he was going to post nude pictures of her, taken without her consent, on the internet. And on a different occasion, Alvarez told an officer at the hospital where she works that she sought a divorce from Alvear. Despite the protective order, Alvear had "followed her home from her" job at the hospital for a "few weeks" and repeatedly called and texted her.

With these allegations, the district court held a revocation hearing. Alvarez did not testify. Instead, the court heard testimony from Alvear's

---

[1] The probation officer also alleged that Alvear had not made payments towards a fine imposed for one of his convictions. Alvear admitted to this violation and does not contest it on appeal.

probation officer, a Dallas police officer, and Alvear's mom. Both the probation officer's and Dallas police officer's testimony included out-of-court statements from Alvarez.

First, the probation officer spoke with Alvarez "on numerous occasions" and "most of [their] conversations [were] about" her relationship with Alvear. The probation officer testified that Alvarez and Alvear lived together. And Alvarez reached out to the probation officer "on multiple occasions" about "concerns for her safety." During one such call, Alvarez told the probation officer about the choking incident the morning after it occurred. The probation officer testified that Alvear and Alvarez "were in an argument the night prior, and [Alvear] accused her of being . . . a name, and she accused him of putting his hands around her neck."

The probation officer also discussed her conversations with Alvear about the incident. Alvear "denied being physically abusive towards [Alvarez] previously." But one day, Alvear offered more detail of the alleged incident. He said that he "put his hands on her cheek[s]" as a "sign of love and affection" that night. Only later did he learn that she had "cut her cheeks" on "her braces when he did that."

Next, a Dallas police officer testified. He was one of the officers who responded to Alvarez's March 2018 call regarding the choking incident. The officer recounted that Alvarez told him that "she was assaulted by" Alvear. Alvear "grabbed her by the neck while she was driving . . . and began choking her." She had a "hard time breathing," but she waited until the next morning to call because "she was scared." While there was no sign of physical injuries, the police officer described how Alvarez's mannerisms showed "that she was nervous; she was kind of crying" and clearly afraid. The police officer further

described his experience in "domestic violence situations." And he agreed that it is "very common" for "victims to have a reluctance or refusal to testify."

After the Government presented its witnesses, Alvear's counsel established that Alvarez had filed an "affidavit of non-prosecution" to no longer cooperate with the Dallas DA on Alvear's assault charge. Then counsel called one witness—Alvear's mother, Felipa—to rebut the Government's accusations about where Alvear lived. Felipa described how Alvear stayed at her house every single night—including after Alvear and Alvarez got married. Despite their marriage, she said Alvear never moved in with Alvarez.

After the testimony, the district court considered Alvear's objection to those parts of the probation officer's and policer officer's testimony that incorporated Alvarez's out-of-court statements. Alvear argued that he had a right to cross-examine Alvarez. But the district court found there was good cause to forgo cross-examination. And the district court subsequently found that Alvear committed the supervised release violations by a preponderance of the evidence. Choking Alvarez constituted a Grade A violation of the supervised-release conditions. So the district court revoked Alvear's supervised release and sentenced him to 27 additional months of imprisonment.

Alvear timely appealed, arguing the district court erred in its finding of good cause. Our review is *de novo*. *United States v. Jimison*, 825 F.3d 260, 262 (5th Cir. 2016).

II.

In *Morrissey v. Brewer*, the Supreme Court established "the minimum requirements of due process" in parole revocation hearings. 408 U.S. 471, 488–89 (1972). Among these requirements, the Court held that a parolee must have "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." *Id*. at 489.

Subsequent to *Morrissey*, Congress abolished parole and established the current system of supervised release. We have applied *Morrissey*'s due process "minimum" rights to supervised release revocation hearings. *See United States v. McCormick*, 54 F.3d 214, 221 (5th Cir. 1995).

In articulating the *Morrissey* standard, we have established a two-step inquiry. We start by determining if the supervisee's "right to confront witnesses" has been "implicated." *Jimison*, 825 F.3d at 263. Normally, that means we look at whether the district court actually admitted hearsay. *See, e.g., id.* Here, the Government does not contest that the revocation hearing testimony included Alvarez's hearsay and thus "implicated" Alvear's right. *Id.* So, we confine our inquiry to the second step.

For the second step, we look to whether the Government has shown "good cause" to overcome the defendant's "right to confront the hearsay declarant[]" arrayed against him. *McCormick*, 54 F.3d at 221. To determine "good cause," our precedents require us to "weigh the [supervisee's] interest in confrontation of a particular witness against the Government's proffered reasons for pretermitting the confrontation." *United States v. Minnitt*, 617 F.3d 327, 333 (5th Cir. 2010). In this weighing, the Government may also "prevail . . . when the hearsay testimony has strong indicia of reliability." *Jimison*, 825 F.3d at 265 (citing *McCormick*, 54 F.3d at 223). After weighing the facts of this particular case, we find that the Government showed good cause.

A.

We begin by considering Alvear's interest. As we've previously said in a very similar case, Alvear's "interest in finding a means to undermine the putative victim's . . . statements is certainly a strong one." *United States v. Elizondo*, 502 F. App'x 369, 373 (5th Cir. 2012). After all, Alvarez's statements formed the core of the case "offered in court to prove the Grade A violation[]"

of assaulting Alvarez. *Jimison*, 825 F.3d at 264. Since Grade A violations require the revocation of supervised release, U.S.S.G. § 7B1.3(a)(1) (2018), a supervisee's interest is "heightened" when such violations are at issue. *Jimison*, 825 F.3d at 264.

On the other hand, Alvear's interest is diminished by at least two other considerations. First, a supervisee's interest is lessened when he had "ample opportunity to refute the Government's evidence via methods other than cross-examination." *Minnitt*, 617 F.3d at 333–34. In the proceedings below, Alvear introduced Alvarez's affidavit of non-prosecution that at least partially recanted her hearsay statements about the alleged assault. *See Elizondo*, 502 F. App'x at 370. Additionally, Alvear's mom testified to directly refute Alvarez's contention that Alvear lived with her instead. Alvear does not indicate what he believes cross-examination of Alvarez would have additionally yielded for the district court to consider.

Second, we've said that a supervisee's interest is reduced when they do not propose an alternative theory of events. *See Carrion*, 457 F. App'x at 411; *cf. Minnitt*, 617 F.3d at 335; *McCormick*, 54 F.3d at 225. We've said in the lab report context that "speculative false-positive theories . . . offer[ing] no supporting evidence" provide "no legally-significant interest in confrontation." *Minnitt*, 617 F.3d at 335. Instead, the supervisee must put forward their own theory of the case.

To the extent Alvear has a theory of what happened the night of the alleged choking, it is presumably that either no altercation happened or that the altercation did not occur as Alvarez said. And if either of those is Alvear's theory, the probation officer testified about both of them. She recounted how he denied being physically abusive and how he later added additional detail to his story to describe a passionate touching of her face that night. It was that

touching, according to Alvear, that resulted in cuts to Alvarez's cheeks. Thus, Alvear's counter-story was in evidence. And "[t]he plausibility of a conveniently" passionate touching of Alvarez's face "to deny [her] statements . . . could be weighed by the district court." *Elizondo*, 502 F. App'x at 373.

Thus, while Alvear's interest may be heightened, it was undoubtedly diminished by the "context of the specific facts" of the proceedings below. *Id.*

B.

Next, we consider the Government's interest. In assessing this interest, we look to the Government's proffered reason for the hearsay declarant's absence from the hearing or reasons that could be inferred from the record. *Jimison*, 825 F.3d at 264; *McCormick*, 54 F.3d at 221; *United States v. Reza*, 759 F. App'x 269, 272 (5th Cir. 2019) (per curiam). Here, the district court found that Alvarez did not testify because of fear, and we've previously accepted fear as a valid reason for an alleged domestic violence victim not to testify at a revocation hearing. *Reza*, 759 F. App'x at 272; *Elizondo*, 502 F. App'x at 372.

We agree with the district court that there is ample record evidence justifying an inference that Alvarez was too afraid to testify. Before the alleged choking incident, Alvarez had reached out to the probation officer multiple times with fears for her safety. Alvear had threatened her multiple times and in multiple ways. The police officer testified that Alvarez appeared "scared" when he met with her. And Alvarez had a protective order against Alvear, which he repeatedly violated. Accordingly, the district court "plainly found good reasons why the government may be reluctant to call an alleged victim in a domestic violence case to provide live testimony." *Reza*, 759 F. App'x at 272.

Alvear contests this conclusion on essentially two grounds. Neither is availing. First, Alvear argues that a court may not assume a reason from the

record; instead the witness must affirmatively declare their reason for not showing up. But our precedents do not support such a rule. We've previously said that "we deem it unnecessary to remand to [the district] court for it to make explicit that which is already implicit." *McCormick*, 54 F.3d at 221. In other words, inferential conclusions from the "testimony" and the "documentary evidence" are sufficient to evaluate and *find* good cause. *Id.* at 221–26. And, while in *Jimison*, we could not "infer a strong interest" about one "*particular* informant," we did not establish a prohibition on such inferences where there is sufficient record evidence. 825 F.3d at 264 (emphasis added). Nor do we establish such a prohibition today.

Second, Alvear argues that the Government's interest is diminished because it did not try hard enough to get Alvarez to show up to testify. For example, Alvear argues that there was no evidence that the Government attempted to subpoena her or that she would defy that subpoena. For support, Alvear cites a Ninth Circuit decision where the Government failed to subpoena a witness. *See United States v. Comito*, 177 F.3d 1166, 1172 (9th Cir. 1999). But, in this circuit, a failure to subpoena cuts *the other way*. We've previously pointed out that if the *supervisee* "truly believed that the [declarants] may have been able to provide helpful testimony, he could have subpoenaed them himself." *Minnitt*, 617 F.3d at 334. And, in all events, the Ninth Circuit relied on the fact that "the government offered no evidence of any . . . fear" by the declarant. *Comito*, 177 F.3d at 1172. As discussed, there was ample evidence of Alvarez's fear in this case.

Overall, Alvarez's fear, as extensively evidenced in the record, was sufficient to constitute the Government's interest in allowing her out-of-court statements.

8

C.

Finally, we consider whether Alvarez's out of court statements had sufficient indicia of reliability. They did for three reasons.

First, we have found declarants' statements to be reliable when corroborated by physical evidence. *See Reza*, 759 F. App'x at 272; *Elizondo*, 502 F. App'x at 373. And while no one testified that they saw Alvarez's injuries, Alvarez's statements were corroborated by physical manifestations of trauma. The police officer saw her the very next day after the alleged altercation and testified as to Alvarez's "mannerisms," her "nervous[ness]," and her "crying." Moreover, Alvear himself told the probation officer that Alvarez *did* have a physical injury that night—it was just from his passionate touching rather than his alleged choking.

Second, we also have found declarants' statements to be reliable when made "under oath and penalty of perjury." *McCormick*, 54 F.3d at 225. When statements are made under these circumstances, we have found them to be "more reliable than unsworn hearsay generally." *Id.* Here, Alvarez filed a police report and instituted court proceedings against Alvear based on allegations of an altercation that night. These actions—if false or frivolous—carry with them sufficient negative consequences to justify crediting them with more reliability than "unsworn hearsay generally." *Id.*

Finally, we have expressed concern about the reliability of hearsay when there is evidence the witness made the statements with ulterior motives, *Justice*, 430 F. App'x at 278, or other record facts did not "alleviate[] concerns about the [declarant's] reliability," *Jimison*, 825 F.3d at 265. But Alvear has pointed to no record evidence suggesting that Alvarez would be motivated to lie. And the record facts *do* "alleviate concerns about [her] reliability." *Id.* For instance, Alvarez told the same story and acted consistent with it. She called

the probation officer the morning after the altercation. She told the same story again to police officers. And consistent with those allegations, she sought a protective order, which she maintained.

Accordingly, Alvarez's statements had sufficient indicia of reliability.

\*     \*     \*

The Government had a strong interest in allowing in Alvarez's out-of-court statements, which we find to have had sufficient indicia of reliability. Therefore, we hold the Government's interest outweighed Alvear's, and there was good cause to forgo cross-examination of Alvarez.[2]

AFFIRMED.

---

[2] Alvear additionally argues that he has an "absolute right to confront an accuser under the Sixth Amendment" and that a jury needed to find, beyond a reasonable doubt, "the facts that gave rise to [his] revocation." As Alvear acknowledges, however, both arguments are foreclosed by precedent. *See Jimison*, 825 F.3d at 263; *United States v. Hinson*, 429 F.3d 114, 119 (5th Cir. 2005).

No. 19-10040
c/w No. 19-10041

ANDREW S. OLDHAM, Circuit Judge, concurring.

I concur in the court's opinion. I write separately because, in an appropriate case, our en banc court should revisit our understanding of the defendant's right to confront witnesses.

Let's start with the confrontation right at trial. That right is protected by the Sixth Amendment. It provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. "This language 'comes to us on faded parchment.'" *Coy v. Iowa*, 487 U.S. 1012, 1015 (1988) (quoting *California v. Green*, 399 U.S. 149, 174 (1970) (Harlan, J., concurring)). But we know it has ancient origins. *See, e.g.*, *Fenwick's Trial*, 13 How. St. Tr. 537, 591–92, 638 (1696). And we know it prohibits the notorious practice of trial-by-affidavit. *See, e.g.*, *Raleigh's Trial*, 2 How. St. Tr. 1, 16 (1603) (refusing Raleigh's demand to "[c]all my accuser before my face"); *id.* at 19 (refusing Raleigh's demand to "let my Accuser come face to face, and be deposed"); 1 J. STEPHEN, A HISTORY OF THE CRIMINAL LAW OF ENGLAND 333–36 (1883) (recounting that the King executed Sir Walter Raleigh on the basis of an affidavit by an absent accuser named Cobham).

We also know that the Confrontation Clause has provided fruitful grounds for federal litigation in recent times. According to a line of decisions starting with *Crawford v. Washington*, 541 U.S. 36 (2004), the Clause "prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Ohio v. Clark*, 135 S. Ct. 2173, 2179 (2015) (quoting *Crawford*, 541 U.S. at 54). Admittedly, our understanding of what's "testimonial" has changed over time. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 330 (2009) (Kennedy, J., dissenting) ("It is remarkable that the Court so confidently disregards a century of

11

jurisprudence. We learn now that we have misinterpreted the Confrontation Clause . . . for the first 218 years of its existence."). And it appears that our understanding of the Confrontation Clause is still evolving. *See, e.g.*, *United States v. Foster*, 753 F. App'x 307, 312 (5th Cir. 2018) (holding the Confrontation Clause requires the Government to make a "reasonable effort" to produce human-trafficking victims, *even if* they had been removed from the United States before trial and hence were beyond the Government's subpoena power).

We've paid less attention to the confrontation right at revocation hearings. The Sixth Amendment obviously does not apply in such hearings because they are not "criminal prosecutions." U.S. CONST. amend. VI. Nevertheless, the Supreme Court and ours have recognized a right to confront certain witnesses during revocation hearings. We've pointed to two founts of that right.

The first is a Federal Rule of Criminal Procedure. Rule 32.1 gives the defendant the right "to question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." FED. R. CRIM. P. 32.1(b)(2)(C).

The second source of a supervisee's confrontation right is the Due Process Clause. The Supreme Court originally recognized this right under the Fourteenth Amendment's Due Process Clause in the context of state-level parole-revocation hearings. *See Morrissey v. Brewer*, 408 U.S. 471, 489 (1972) (holding the due-process minimum for parole-revocation hearings includes "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)"). Of course, federal prisoners do not have parole or the protections of the Fourteenth Amendment; they instead have supervised release and the Fifth Amendment.

12

Nevertheless, without apparent analysis, we've simply said the same constitutional rules apply in both contexts. *E.g.*, *United States v. McCormick*, 54 F.3d 214, 221 (5th Cir. 1995).

All of this evolution and cross-referencing has created three oddities for federal prisoners. First, it's unclear what if anything the Due Process Clause adds to the protections of Rule 32.1(b)(2)(C). The Supreme Court told us in *Morrissey* that "[w]e cannot write a code of procedure; that is the responsibility of each State." 408 U.S. at 488. And when the States write their codes for parole revocation, they must do so in accordance with "the minimum requirements of due process"—which guarantee *inter alia* "the right to confront and cross-examine adverse witnesses" absent "good cause." *Id.* at 488–89. Of course, the Supreme Court *did* "write a code of criminal procedure" for *federal* prisoners. And I'd assume that the provisions of that code—including Rule 32.1(b)(2)(C)— satisfy the Fifth Amendment's Due Process Clause. So it seems odd that we're talking about the Constitution at all; why not just apply Rule 32.1?

Second, instead of applying Rule 32.1(b)(2)(C), many of our decisions in this area contain nary a citation to it. Instead, we often decide these questions *only* under the Due Process Clause. *See, e.g.*, *United States v. Jimison*, 825 F.3d 260, 262 (5th Cir. 2016); *United States v. Minnitt*, 617 F.3d 327, 332–33 (5th Cir. 2010). That's odd because the standards are not textually identical. The Due Process right can be overcome for "good cause," *Jimison*, 825 F.3d at 263, whereas the Rule 32.1 right can be overcome in "the interest of justice." FED. R. CRIM. P. 32.1(b)(2)(C). Maybe "good cause" and the "interest of justice" are the same thing. *Cf. McCormick*, 54 F.3d at 221 (saying without analysis that "[t]he due process requirements recognized in *Morrissey* are incorporated in

13

Federal Rule of Criminal Procedure 32.1[(b)(2)(C)[1]], which is applicable to supervised release revocation proceedings"). Maybe they're different. *See United States v. Reza*, 759 F. App'x 269, 271–72 (5th Cir. 2019) (per curiam). Either way, I'd think we should figure out the meaning of the Rule *first*, lest we render unnecessary constitutional pronouncements. *See, e.g., Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) ("[I]t is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." (quotation omitted)). It's odd that we instead treat all of these cases as constitutional ones.

Third, oddest of all, sometimes the confrontation right in a revocation hearing can be *broader* than the confrontation right at trial. The Supreme Court has told us that protections in a revocation hearing are (at most) the same as those at trial. *See United States v. Haymond*, 139 S. Ct. 2369, 2378–79 (2019) (plurality opinion); *id.* at 2385–86 (Breyer, J., concurring in the judgment). That result creates its own difficulties. *See id.* at 2390–91 (Alito, J., dissenting). But it's an altogether different problem to make the constitutional protections in the revocation hearing *broader* than at trial. After all, one premise of our system is that post-conviction rights are generally narrower because "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears."

---

[1] When we decided *McCormick*, the relevant provision of Rule 32.1 gave the defendant "the opportunity to question adverse witnesses." FED. R. CRIM. P. 32.1(a)(2)(D) (1995). That text obviously says nothing about "good cause" or the "interest of justice." Following our decision in *McCormick*, Rule 32.1 was "completely revised and expanded." FED. R. CRIM. P. 32.1 advisory committee's note to 2002 amendments. Those revisions moved the confrontation right from Rule 32.1(a)(2)(D) to its current home in Rule 32.1(b)(2)(C) and added the current "interest of justice" exception. But we've continued applying *McCormick* without apparent analysis of these textual differences. *See, e.g., Jimison*, 825 F.3d at 265; *Minnitt*, 617 F.3d at 333.

*Herrera v. Collins*, 506 U.S. 390, 399 (1993). But when we ask different questions under the Confrontation Clause at trial (is the statement "testimonial"?) and under the Due Process Clause at revocation (is there "good cause" to admit the statement?), we can get incongruous answers.

Consider an example. A boyfriend violently attacks his girlfriend who then immediately calls 911. The Government wants to use her statements to the 911 operator against the boyfriend. At trial, the defendant has no right to prevent the introduction of these statements under the Confrontation Clause because they're not "testimonial." *Clark*, 135 S. Ct. at 2179 (citing *Davis v. Washington*, 547 U.S. 813, 820 (2006)). But this same 911 call is almost certainly hearsay. So at the boyfriend's revocation hearing, he *can* object to the introduction of the statements under the Due Process Clause, unless there is "good cause" to admit them. *See, e.g.*, *Jimison*, 825 F.3d at 263.

The oddities don't end there. The Federal Rules of Evidence apply at trial. And they provide for the admission of all sorts of hearsay: an excited utterance, a statement made for medical treatment, a present sense impression, a business record, a statement against interest, &c. *See* FED. R. EVID. 803, 804. But the hearsay rules in the Federal Rules of Evidence do not apply in revocation hearings. FED. R. EVID. 1101(d)(3); *Reza*, 759 F. App'x at 271. So if the Government wants to use these same (otherwise-admissible) hearsay statements at a revocation hearing, the court has to apply the "good cause" analysis demanded by the Due Process Clause. That's an additional hurdle that applies post-conviction that does not apply pre-conviction.[2] How odd.

---

[2] Perhaps recognizing this, the Second Circuit has held the Due Process Clause does not "oblige[] the district court to perform a good-cause analysis with respect to a proffered out-of-court statement [that] is admissible under an established exception to the hearsay

No. 19-10040
c/w No. 19-10041

At some point, we should square this circle.

---

rule." *United States v. Williams*, 443 F.3d 35, 45 (2d Cir. 2006) (quotation omitted). As far as I can tell, we do not have the same rule in our Circuit.