# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
January 6, 2012

No. 11-10211

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

ROY TONCHE CARRION,

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 1:05-CR-6-1

Before KING, JOLLY, and WIENER, Circuit Judges.

PER CURIAM:[*]

Defendant-Appellant Roy Tonche Carrion appeals the revocation of his supervised release, asserting that the district court erred in his revocation hearing when it admitted prior expert testimony on the reliability of "sweat patch" drug testing. We find no reversible error, and affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant-Appellant Roy Tonche Carrion ("Carrion") began a three-year term of supervised release on November 23, 2009, after serving a thirty-month

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-10211

prison sentence for possession with intent to distribute cocaine and aiding and abetting in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C) and 18 U.S.C. § 2. Carrion's conditions of supervised release prohibited (1) illegal possession or use of a controlled substance, (2) excessive use of alcohol, and (3) possession of drug-related paraphernalia. Carrion was also ordered to "submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter," and to "participate in a program . . . for treatment of narcotic, drug, or alcohol dependence, which will include testing for the detection of substance use or abuse."

From his release in November 2009 until December 2010, Carrion missed counseling sessions, showed up late for urinalysis collections, and consumed alcohol on one occasion. At the time, Carrion's probation officer, Connie Massey ("Massey"), did not recommend revocation because she believed that Carrion wanted to improve. Massey revised her approach in January 2011, and petitioned for Carrion's arrest. She filed a Supervised Release Violation Report, alleging that Carrion violated the terms of his supervised release by failing to timely report for random drug testing on three occasions and by testing positive for alcohol and cocaine use. Carrion's cocaine use was evidenced by the results of a PharmChem sweat patch test (the "sweat patch") that fellow probation officer Scott Cannon ("Cannon") had applied to Carrion. On January 28, 2011, the government moved to revoke Carrion's supervised release based upon the violations that Massey detailed.

At the revocation hearing, the government called probation officers Massey and Cannon. Massey testified that she ordered Carrion to submit to sweat patch drug testing after becoming concerned that Carrion was intentionally diluting his urine in order to avoid positive test results. According to Massey, sweat patch testing involves a "patch that is placed on the skin and covered with a covering and is worn for anywhere from a day to two weeks, and then it's taken off; it's

2

sent to the lab and tested." She also explained that it is a "Band-Aid type mechanism that is placed normally on the arm, sometimes in other locations that are approved. . . . It is there to collect the sweat from an individual; then the patch is removed, it's sent to a lab, and that sweat patch is tested for illicit drug use." Importantly, the results of the sweat patch test reflect the existence of "cocaine metabolite," which is secreted by the body after ingestion, rather than actual cocaine.

Cannon testified regarding his training in sweat patch application and the reliability of the sweat patch. When questioned regarding the reliability of the test, Cannon referenced a case in the Western District of Texas in which Dr. Leo Kadehjian, a consulting toxicologist to the Administrative Office of the United States Courts, testified concerning the science and reliability of sweat patch drug testing. He stated that, prior to the revocation hearing, the government contacted Dr. Kadehjian and another expert, Dr. Koontz, but both were unavailable to testify. Dr. Kadehjian was in California at the time, and Dr. Koontz was in Chicago. Cannon testified that he had reviewed a transcript of Dr. Kadehjian's testimony in the prior case (*United States v. Kinney*, No. W-01-CR-99 (W.D. Tex.)), and the government tendered the transcript as an exhibit ("Exhibit 3"). Carrion's counsel objected to the testimony as follows:

> Your Honor, if I may, we would object to the admission of this document. Specifically, Your Honor, this is the testimony. This isn't a report. This isn't a peer-reviewed article. This is the testimony of this Dr. Leo Kadehjian—Kadehjian. He is—from my research, Your Honor, he is the hired expert by PharmChem and PharmChek to come and testify to the validity of this issue. It presents problems between proffer, between—between confrontation and with due process, Your Honor. He has a specific agenda and specific testimony that he gives, and that certainly, Your Honor, we would request, should be subject to cross-examination in determining the weight and the credibility specifically of the PharmChek sweat patch.

No. 11-10211

The district court overruled the objection and admitted the transcript without an explicit finding that there was good cause to do so.

Cannon testified that he was trained in the application and removal of sweat patches but not in the science of sweat patch testing. He stated that he applied a sweat patch to Carrion while in an office at Carrion's workplace, an auto auction facility where Carrion cleaned out wrecked cars. When applying the sweat patch, he looked for a spot on Carrion's body without tattoos (consistent with the application instructions), and he placed the patch on the back of the inside of one of Carrion's arms, after cleaning the area with two alcohol swabs. Cannon removed the patch six days later during Carrion's visit to the probation office, and it was sent to Kansas for analysis. PharmChem reported that the sweat patch tested positive for cocaine metabolite on December 20, 2010.

Cannon then read portions of Dr. Kadehjian's prior testimony, specifically regarding the reliability of sweat patch testing and its recognition by the Food and Drug Administration ("FDA") as well as the Substance Abuse Mental Health Services Administration. Cannon also recounted Dr. Kadehjian's professional background and his experience as an expert witness. Carrion was granted a continuing objection to the testimony.

During cross-examination, Cannon admitted that he did not instruct Carrion to clean his arm with soap and water prior to the application of the sweat patch, as recommended by PharmChem. Carrion then introduced three studies (referred to in the revocation hearing as Exhibits 2-A, 2-B, and 2-C) that refuted the accuracy of sweat patch drug testing due to the possibility of external contamination, including one study by the U.S. Naval Research Laboratory. Cannon acknowledged that Dr. Kadehjian had not been questioned on all of these particular studies, but noted the doctor's testimony that "no patch can be reported as positive for cocaine unless the metabolite is shown to be present as an extra assurance that the patch was truly reflecting ingestion of cocaine."

4

No. 11-10211

According to Cannon, this ensures that positive test results would not be due to external contamination.

Carrion testified in his own defense, and admitted that he had used alcohol, as reflected by the positive test result. He stated that his job involved cleaning cars damaged in accidents and that they often contained blood, trash, beer cans, and other items. He did not wear protective clothing and only wore gloves when he saw that a car was very bloody or had broken glass. Carrion stated that he had not used cocaine since 2004, and had not used or knowingly been around cocaine since he began supervised release in November 2009.

During closing argument, Carrion's counsel argued that the positive sweat patch result was caused by outside contamination. He argued:

> [the peer-review articles] explain in detail the fallibility of the sweat patch. What [Dr. Kadehjian] refers to as an impossibility in a real-world situation, number one, only applies to contaminations from without, the permeability of the actual adhesive covering of the sweat patch. He doesn't even address contaminations from within, which is referred to as drugs or substances that could be left on the skin.

Counsel conceded that the "test is reliable" after the patch is removed and analyzed at the lab, but argued that "the fallibility of this test comes to the application and the procedures and the process that go into it."

The district court found that the government had proven the allegations against Carrion by a preponderance of the evidence, and it revoked Carrion's supervised release. It found that Carrion had "a Grade C violation, with a Criminal History Category of IV," and it sentenced him to twelve months of imprisonment with no further supervised release. Carrion timely appealed.

## II. STANDARD OF REVIEW

"A district court may revoke a defendant's supervised release if it finds by a preponderance of the evidence that a condition of release has been violated." *United States v. Minnitt*, 617 F.3d 327, 332 (5th Cir. 2010). "The decision to

5

No. 11-10211

revoke supervised release is reviewed under an abuse of discretion standard, but the constitutional challenge about the right of confrontation of adverse witnesses is reviewed *de novo.*" *United States v. Grandlund*, 71 F.3d 507, 509 (5th Cir. 1995) (footnote omitted). Alleged violations of this right are subject to a harmless error analysis. *United States v. McCormick*, 54 F.3d 214, 219 (5th Cir. 1995).

### III. ANALYSIS

On appeal, Carrion contends that the district court reversibly erred when it admitted Dr. Kadehjian's prior expert testimony on the reliability of sweat patch drug testing without finding good cause for not allowing cross-examination. We find no reversible error, as the district court's failure to make a good cause finding on the record was harmless.[1]

A releasee facing revocation of parole or supervised release enjoys more limited rights than does a defendant facing a criminal prosecution. *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972).[2] While due process provides a releasee in a revocation hearing the right to confront and cross-examine adverse witnesses, the district judge may deny this right if there is good cause for not allowing

---

[1] As an initial matter, we reject the government's contention that Carrion waived his good cause argument by failing to properly object in the district court. When the government sought to admit Dr. Kadehjian's testimony, counsel objected on "confrontation and . . . due process" grounds, and also requested that Dr. Kadehjian "be subject to cross-examination in determining the weight and the credibility specifically of the PharmChek sweat patch." This objection is sufficient to preserve the argument for appeal. *See* FED. R. CRIM. P. 51(b); *United States v. Musa*, 45 F.3d 922, 924 n.5 (5th Cir. 1995) ("To preserve an issue for review on appeal, the defendant's objection must fully apprise the trial judge of the grounds for the objection so that evidence can be taken and argument received on the issue."); *see also United States v. Mendoza*, 414 F. App'x 714, 718 (5th Cir. 2011) (citing *McBride v. Johnson*, 118 F.3d 432, 437 (5th Cir. 1997)).

[2] The "same protections granted those facing revocation of parole are required for those facing the revocation of supervised release." *McCormick*, 54 F.3d at 221 (quoting *United States v. Copeland*, 20 F.3d 412, 414 (11 Cir. 1994)); *see* FED. R. CRIM. P. 32.1(b)(2) (revocation hearing procedures).

confrontation. *Id.* at 489.[3] "To deny confrontation, the district court must specifically find good cause and must make the reasons for its finding part of the record." *Minnitt*, 617 F.3d at 333. In evaluating good cause, the district court "must employ a balancing test which weighs the defendant's interest in the confrontation of a particular witness against the government's interest in the matter." *Grandlund*, 71 F.3d at 510. The good cause requirement is "flexible . . . depending in part on the importance of the testimony and the parolee's need to confront the witness." *Barnes v. Johnson*, 184 F.3d 451, 456 (5th Cir. 1999); *see also McCormick*, 54 F.3d at 225 (stating that evidentiary rules should be applied "flexibly in revocation hearings," consistent with *Morrissey*).

Although we have stated that a district court must make a "good cause" finding on the record, a court's failure to do so may constitute harmless error. The error is harmless where "[1] good cause exists, [2] its basis is found in the record, and [3] its finding is implicit in the court's rulings." *Minnitt*, 617 F.3d at 333 (quoting *Grandlund*, 71 F.3d at 510). Because the district court in this case erred in failing to make a good cause finding on the record, we must evaluate these three factors to determine whether that error was harmless.

## A.    *Good Cause Exists*

In determining a releasee's interest in cross-examination, we have focused on the following considerations, amongst others: (1) whether the evidence at

---

[3] The Sixth Amendment right to confrontation does not apply in revocation proceedings; rather, the "defendant has the right to confront witnesses under FED. R. CRIM. P. 32.1 and the Fifth Amendment." *Mendoza*, 414 F. App'x at 718 n.7. This court has also concluded that *Crawford v. Washington*, 541 U.S. 36 (2004), does not apply to revocation proceedings. *United States v. Denson*, 224 F. App'x 417, 418 (5th Cir. 2007). This holding is consistent with that of other circuits that have considered the issue. *See United States v. Kelley*, 446 F.3d 688, 691-92 (7th Cir. 2006); *Ash v. Reilly*, 431 F.3d 826, 829-30 (D.C. Cir. 2005); *United States v. Rondeau*, 430 F.3d 44, 47-48 (1st Cir. 2005); *United States v. Hall*, 419 F.3d 980, 985-86 (9th Cir. 2005); *United States v. Kirby*, 418 F.3d 621, 627-28 (6th Cir. 2005); *United States v. Aspinall*, 389 F.3d 332, 342-43 (2d Cir. 2004), *abrogation on other grounds recognized, United States v. Fleming*, 397 F.3d 95, 99 n.5 (2d Cir. 2005); *United States v. Martin*, 382 F.3d 840, 844 n.4 (8th Cir. 2004).

No. 11-10211

issue is important to the district court's ultimate revocation determination; (2) whether the evidence relates to an alleged violation that triggers mandatory revocation or a mandatory minimum sentence; (3) whether the releasee had an opportunity to refute the evidence through methods other than cross-examination (such as re-testing, subpoenas, or presentation of expert testimony); (4) whether the testimony at issue involves "scientifically-verifiable facts;"[4] and (5) whether the releasee has presented evidence to support the alternate theory that he seeks to explore on cross-examination. *See Minnitt*, 617 F.3d at 333-35; *McCormick*, 54 F.3d at 222-23.

Carrion's interest in cross-examination of Dr. Kadehjian is minimal, as only two considerations weigh in his favor. Specifically, the reliability of the sweat patch was likely important to the court's decision in the supervised release hearing, and this evidence was important to the outcome of the hearing because use of a controlled substance triggers mandatory revocation of supervised release. 18 U.S.C. § 3583(g)(1); *see Minnitt*, 617 F.3d at 333. The remaining factors do not support Carrion's interest.

First, despite his argument to the contrary, Carrion could have refuted Dr. Kadehjian's testimony through methods other than cross-examination. If he wanted to challenge the sweat patch results, Carrion could have called his own experts to support his external contamination theory. Carrion contends that he did not know that Dr. Kadehjian's testimony would be proffered until the hearing itself. While this is a reasonable explanation for Carrion's failure to subpoena Dr. Kadehjian, it cannot justify his failure to submit his own expert

---

[4] As this court explained in *McCormick*, 54 F.3d at 222, "a releasee's interest in cross-examining a laboratory technician regarding a scientific fact is less than would be his interest, for example, in confronting a hearsay declarant regarding what the declarant may have seen. The truth of the former can be verified through methods of science; the truth of the latter can best be verified through the rigor of cross-examination, conducted under the circumspect eye of the district court." *Id.*

No. 11-10211

testimony. Carrion certainly knew that the sweat patch results would figure prominently at the hearing, and he could have undertaken efforts to discredit the results' reliability through other means available to him.  Finally, Carrion's counsel could have requested a continuance for the purpose of developing his own expert testimony or attempting to subpoena Dr. Kadehjian, but he failed to do so.

Second, Dr. Kadehjian's testimony involved scientifically verifiable facts. We have recognized that "a releasee's interest in cross-examining a laboratory technician regarding a scientific fact is minimal because the truth of the fact can best be verified through the methods of science rather than through the rigor of cross-examination." *Minnitt*, 617 F.3d at 333 (citation and internal quotation marks omitted). While Dr. Kadehjian is not a lab technician, the same rationale applies. The reliability of the sweat patch test can best be examined through the scientific method rather than cross-examination.

Third, Carrion's interest in confrontation is minimal in light of the prior cross-examination of Dr. Kadehjian. To support his theory, Carrion presented three studies (referenced above), which suggested that external contamination could cause a false positive result in certain circumstances. Carrion also asserted that he worked at an auto auction facility cleaning out dirty cars, and that Officer Cannon did not fully comply with the recommended application procedures. Carrion essentially posits that cocaine residue was transferred to his body while cleaning out cars, this residue remained on his body when the patch was applied, and the residue was responsible for the false positive result. Carrion's presentation of conflicting evidence separates this case somewhat from our prior decisions in *McCormick*, *Grandlund*, and *Minnitt*, as the releasees in those cases did not provide evidence to support their contamination or false-positive theories. Nevertheless, these theories were sufficiently explored upon cross-examination of Dr. Kadehjian in *United States v. Kinney*. On direct

9

examination in that case, Dr. Kadehjian explained that "any time there's drug use and excreted in the sweat, it can be detected in the patch," and that the patch "collects sweat from the wearer throughout the period of patch wear and any drugs that are ingested and excreted in the sweat will be trapped in the patch." Kadehjian also acknowledged that while certain studies had questioned the patch's accuracy, "by far and away 95 percent of the published literature supports the patch as an accurate and reliable device." On cross-examination, defense counsel inquired into how the patch detects drugs:

> Q:  Okay. Well, in other words, being a layperson, we're talking about something that you're detecting in sweat, correct?
>
> A:  That's correct. The sweat patch collects the sweat and any drugs that are contained in the sweat.
>
> Q:  Okay. So to get to the sweat, it has to be ingested, be processed through the body in some way and be expelled or eliminated through sweat, correct?
>
> A:  Yes, sir.

Later, defense counsel asked about studies that questioned the reliability of sweat patches. With respect to external contamination, Dr. Kadehjian was questioned as follows:

> Q:  Okay. And one of those other – one of those other possible explanations or reasons for positive results would be external factors, external variables or – external factors, external variables?
>
> A:  I'll answer by detailing the paper that brings that issue up. In data submitted to the FDA, Pharm-Chem showed that the patch was impermeable effectively to contaminants from outside the patch. . . . [C]ontaminants from the environment were demonstrated not to go through the patch. One research group did demonstrate under laboratory conditions that they could effectively make drugs go through the patch from the outside environment into the patch. I've reviewed those

> papers critically. . . . And my review of that data is that it's
> only under a rather unique set of . . . unrealistic conditions
> that they were able to demonstrate that they could make
> drugs go through the patch from the environment. In my
> opinion, absent any showing that these laboratory type
> conditions . . . exist, I would hold that there is no reasonable
> basis to presume that anyone wearing a patch in a real world
> setting would have a positive result from anything other than
> drug use.

Dr. Kadehjian confirmed that the study discussed in the above testimony was the one performed by the U.S. Naval Research Laboratory, a study upon which Carrion relied to support his contamination theory. Although Dr. Kadehjian was not specifically cross-examined on the other studies that Carrion presented in the district court, those other studies were in existence when Dr. Kadehjian testified in *Kinney* and we can reasonably assume that those studies did not alter his expert opinion on the reliability of sweat patch drug testing.

Carrion argues that the prior cross-examination of Dr. Kadehjian in *Kinney* was a poor substitute, as it did not explore Carrion's false-positive theory, Kinney did not have the same interest and motivation to ask about "under-the-patch" contamination, and the record from the previous case did not detail the patch application procedures. We disagree. To believe Carrion's theory, the court would have to conclude that another person's cocaine *metabolite*, not cocaine itself, was transferred to Carrion's arm while he was at work, and remained there when the patch was applied. Even if such a theory were plausible, it is quite clear that it would not have been aided by cross-examination of Dr. Kadehjian. As detailed above, Dr. Kadehjian explained that the sweat patch "collects the sweat and any drugs that are contained in the sweat," and confirmed that for drugs to be contained in the sweat, they have to be "ingested." He also stated that there "is no reasonable basis to presume that anyone wearing a patch in a real world setting would have a positive result from

anything other than drug use." This testimony significantly discounts Carrion's defense. In light of Dr. Kadehjian's former testimony, there is even a possibility that cross-examination would have in fact undermined Carrion's theory. Because Dr. Kadehjian was previously cross-examined on the same general theory that Carrion now advances here, Carrion's ultimate interest in confrontation is minimal.

In contrast, the government had a significant interest in admitting Dr. Kadehjian's testimony over Carrion's objection. When examining the government's interest, this court considers the reliability of the testimony at issue and the "delay, difficulty, and expense of securing the appearance of distant witnesses." *Grandlund*, 71 F.3d at 511; *see Minnitt*, 617 F.3d at 334. Reliability is a "critical consideration" in the good cause determination. *Grandlund*, 71 F.3d at 510. In determining reliability, we have considered whether the oral hearsay was given "under oath and penalty of perjury," and whether the testimony at issue "is essentially a scientific fact which . . . can be verified or refuted through scientific methods." *McCormick*, 54 F.3d at 225.

The record demonstrates that Dr. Kahedjian's testimony was reliable. First, Dr. Kahedjian has strong expert credentials, as he holds a bachelor's degree in organic chemistry from the Massachusetts Institute of Technology and a doctorate in biochemistry from Stanford University. He has served as a consulting toxicologist to the Administrative Office of the United States Courts, taught at the National Judicial College, and published numerous papers on sweat patches. He is not employed by PharmChem. Second, his prior testimony was presented in court, under oath, and subject to cross-examination.[5] Third, Dr. Kadehjian's testimony is scientific in nature, and his discussion of scientific

---

[5] In this respect, the testimony here is equally or even more reliable than the affidavit submitted in *McCormick*, which we found to have "significant indicia of reliability." 54 F.3d at 225.

studies and experiments with the patch can be "verified or refuted through scientific methods." *Id.* Other courts have found both sweat patch testing and Dr. Kadehjian's analysis and conclusions to be reliable. *See United States v. Meyer*, 483 F.3d 865, 869 (8th Cir. 2007) ("[S]weat patch results are a generally reliable method of determining whether an offender has violated a condition of his or her probation. . . . We also place weight on the expertise of Dr. Kadehjian, who vouched for the general reliability of sweat patch results.") (O'Connor, J., sitting by designation); *see also United States v. Zubeck*, 248 F. Supp. 2d 895, 899 (W.D. Mo. 2002) (finding "Dr. Kadehjian's explanation of PharmChem's findings to be credible").

The parties also agree that Dr. Kadehjian was not available to testify at Carrion's supervised release hearing, as he was in California at the time. As such, it would have been difficult and expensive for the doctor to testify live at Carrion's supervised release hearing. *See Minnitt*, 617 F.3d at 334; *McCormick*, 54 F.3d at 224.

In sum, the government had a strong interest in admitting Dr. Kadehjian's testimony. The case for admitting Dr. Kadehjian's testimony here is even stronger than was the case for admitting a lab director's hearsay statements in *Minnitt*. There, the court found good cause for admission of the statements even though they were not made under oath, and were instead made to a probation officer who had questioned the director about the viability of Minnitt's various false positive theories. 617 F.3d at 334-35. In contrast, Dr. Kadehjian testified under oath and was subject to full cross-examination by a releasee who raised at least the same general contamination theories that Carrion advances and who had the same interest in discrediting the test results. We conclude that Carrion's interest in confronting Dr. Kadehjian is outweighed by the government's interests in admitting his prior testimony, and therefore, there was "good cause" to deny Carrion the opportunity to cross-examine Dr. Kadehjian.

*B.    Good Cause Found in the Record*

As demonstrated above, the record contains sufficient evidence demonstrating good cause, which existed prior to the district court's ruling on the subject. *See, e.g.*, *Minnitt*, 617 F.3d at 333. First, the record demonstrates that Dr. Kadehjian was in California, and was therefore not available to testify. Second, Dr. Kadehjian's testimony listed his credentials and experience, which demonstrate his reliability. Third, his testimony reflected the prior cross-examination by defense counsel in *Kinney*, which addressed issues of reliability and contamination now raised by Carrion.

*C.    Good Cause Implicit in the Court's Ruling*

The final consideration requires us to determine whether the good cause finding is "implicit in the court's ruling." *Grandlund*, 71 F.3d at 510. The government contends that the district court reviewed Exhibit 3 and impliedly found "good cause" to deny Carrion's objections, and this finding is fully consistent with Dr. Kadehjian's credentials, expertise, and standing in the federal courts. We agree.

In *McCormick*, the panel held that the good cause finding was implicit in the district court's ruling, and provided the following analysis:

> In light of the at-best marginal benefit to be gained by requiring those [laboratory] technicians to submit to cross-examination, the significant number of available but unavailed options to confront the urinalysis report, the reliability of this particular urinalysis report, and the difficulty and cost associated with requiring those technicians to appear at the hearing, we conclude that the record supports an implicit finding by the district court that the government showed good cause for denying McCormick's right to confront the laboratory technicians.

*McCormick*, 54 F.3d at 224. The record here supports an implicit finding that Carrion's interest in cross-examining Dr. Kadehjian was outweighed by the government's interest in admitting Dr. Kadehjian's prior testimony, in light of

No. 11-10211

the reliability of that testimony and the limited utility of confrontation in this instance. We therefore "deem it unnecessary to remand to [the district] court for it to make explicit that which is already implicit." *Id.* at 221.

## IV. CONCLUSION

In light of the foregoing, the district court's judgment of revocation is AFFIRMED.


Judge Jolly concurs only in the judgment.