NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1747
_____

UNITED STATES OF AMERICA

v.

MELISSA HICKS,

Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 05-cr-00019-1)
District Judge:  Hon. Maurice B. Cohill, Jr.
_____

Submitted Under Third Circuit LAR 34.1(a)
January 10, 2013

Before:  RENDELL, FISHER, and JORDAN, *Circuit Judges*.

(Filed:  January 14, 2013)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Melissa Hicks[1] appeals an order by the United States District Court for the Western District of Pennsylvania revoking her supervised release and sentencing her to 60 months' imprisonment. For the following reasons, we will affirm.

## I.     Background

Hicks has had a remarkable criminal career, with more than 40 convictions for theft, forgery, and related crimes since her first conviction at the age of 20. Most recently, on May 3, 2006, she pled guilty in the United States District Court for the Western District of Pennsylvania to one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 1); eight counts of possessing counterfeit securities, in violation of 18 U.S.C. § 513(a) (Counts 2-9); and one count of possession of five or more identification documents with the intent to use them unlawfully, in violation of 18 U.S.C. § 1028(a)(3) (Count 10). Those charges arose from Hicks's repeated efforts to purchase merchandise through identity theft and the use of fraudulent checks, and they resulted in a sentence of 60 months' imprisonment for Counts 2-9 and 30 months' imprisonment for Counts 1 and 10, all to be served concurrently. The District Court also sentenced Hicks to a three-year term of supervised release and ordered her to pay $15,751.87 in restitution.

On September 12, 2010, Hicks concluded her prison sentence and began her period of supervised release. Seventeen months later, on February 10, 2012, she was

_____

[1] Hicks's legal name is now Roiann Johnson.

2

arrested in Tennessee after a search of the car in which she was a passenger uncovered evidence of identity theft and other fraudulent activity. Specifically, investigating officers discovered a wallet containing 60 different drivers' licenses, Social Security cards, and other identification documents in a suitcase in the trunk of the car. In addition, they found a shoe box containing various W-2 forms, birth certificates, and checks, again in the names of many different individuals. The box also contained handwritten lists of names, birth dates, Social Security numbers, and checking account numbers. After providing contradictory statements to police and admitting to ownership of some of the documents, Hicks was charged under Tennessee law with 60 counts of identity theft. The driver of the vehicle, Ricardo Dutrieculle, was also arrested and was later discovered to be a convicted felon.

Five days later, the District Court issued a warrant for Hicks's arrest due to multiple violations of the terms of her supervised release. According to a petition filed with the Court by Hicks's probation officer, she had violated four different conditions of her release, namely that (1) "[t]he defendant shall not commit another federal, state or local crime"; (2) "the defendant shall not leave the judicial district without the permission of the court or probation officer"; (3) "the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;" and (4) the

3

defendant shall "refrain from any unlawful use of a controlled substance."[2]  (App. at 141-42, 146.)

On February 29, 2012, the District Court held a hearing to consider the possible revocation of Hicks's supervised release.  At that hearing, Hicks conceded that she left Pennsylvania without permission, in violation of the terms of her release, and that she had used a controlled substance.  She claimed that she had not, however, committed another crime.  She further argued that she had been unaware that Dutrieculle had a criminal history, and she said that her cocaine use should not be considered a violation of supervised release because her probation officer had already addressed that issue by mandating substance abuse counseling.

In response, the government presented evidence that Hicks was guilty of multiple forms of fraud and identity theft.  In addition to introducing into evidence the myriad documents seized in the search, the government called three live witnesses: David Danko, Hicks's probation officer; Darren Earle, a Secret Service agent who investigated the Tennessee incident; and David Anderchak, a Postal Inspector who had been conducting an independent federal investigation of Hicks prior to her arrest.  Officer Danko testified regarding Hicks's drug use and presented evidence that Dutrieculle was her neighbor, suggesting that she likely knew of his criminal record.  Agent Earle described his investigation of the Tennessee incident and explained that all three adults in the vehicle initially provided false names to police, that Hicks claimed partial ownership over the

---

[2] The first three of those alleged violations arose from the Tennessee incident. The violation of the drug use restriction was based on Hicks's testing positive for cocaine on two occasions in 2011.

4

suitcase in which the wallet containing the identification cards was discovered, and that Hicks initially denied knowledge of the cards and documents but admitted to having handled them once she was reminded that police could analyze them for fingerprints. Inspector Anderchak then described a series of earlier incidents in Pennsylvania in which Hicks attempted to deposit other people's tax refund checks into her account with Citizens Bank. The names on the checks, which were introduced into evidence, matched the names on several of the cards seized during the Tennessee incident. Inspector Anderchak also testified that he had contacted several of the individuals named on the checks, all of whom denied having given Hicks permission to file a tax return on their behalf, much less deposit their tax refunds into her account.[3]

Hicks raised a blanket objection to all of the evidence relating to those new criminal offenses, citing due process concerns. She also sought a "standing objection to all … statements that elicit hearsay." (App. at 170.) The Court permitted the "standing objection," but admitted all of the government's evidence, concluding that, due to the nature of the revocation proceeding, it would "consider any evidence with respect to [the] alleged violations in Tennessee." (App. at 168-69). The Court also summarily denied a renewed hearsay objection that Hicks made to Inspector Anderchak's testimony regarding the additional federal crimes.

At the conclusion of the hearing, the Court agreed with the government that Hicks had violated four different terms of her supervised released. One of those violations –

---

[3] Hicks maintains that she is innocent of any criminal allegations, but does not specifically dispute the accuracy of any of that evidence.

Hicks's commission of another crime – constituted a "Grade B" violation,[4] which mandated revocation of her supervised release. U.S.S.G. §§ 7B1.1(a)(2), 7B1.3(a)(1) . The Court then sentenced Hicks to a six-month term of imprisonment on each of her ten original counts, to be served consecutively for a total of 60 months' imprisonment. That sentence was a significant upward departure from the United States Sentencing Guidelines' recommended range of 21 to 27 months' imprisonment, U.S.S.G. § 7B1.4, but it was well below the statutory maximum of two years per count, 18 U.S.C. § 3583(e)(3).[5] In reaching its decision, the Court considered the factors enumerated in 18 U.S.C. § 3553(a) and emphasized that Hicks's history of recidivism demonstrated the need for a lengthy prison term.

This timely appeal followed.

## II.    Discussion[6]

Hicks argues on appeal that the District Court erred by admitting unreliable hearsay evidence, by concluding on insufficient evidence that she had violated the conditions of her supervised release, and by imposing an unreasonable sentence. She also claims that the overall evidentiary standard applied at the revocation hearing violated her due process rights. We address each of those assertions in turn.

---

[4] The other violations were all Grade C violations. U.S.S.G. § 7B1.1(a)(3).

[5] The sentence was also below the government's recommended sentence of one year per original count, for a total of ten years' imprisonment.

[6] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

A.    *Reliability of the Hearsay Evidence*

As both parties agree, the Federal Rules of Evidence do not apply to proceedings revoking supervised release, and thus hearsay evidence can be admissible in such proceedings when the interest of justice so permits.  Fed. R. Evid. 1101(d)(3); Fed. R. Crim. Pro. 32.1(b)(1)(B)(iii); *see also Morrissey v. Brewer*, 408 U.S. 471, 489 (1972) (concluding "letters, affidavits, and other material that would not be admissible in an adversary criminal trial" can be admissible in a revocation hearing).  But hearsay is not categorically admissible, and "due process requires that supervised releasees retain at least a limited right to confront adverse witnesses in a revocation hearing." *United States v. Lloyd*, 566 F.3d 341, 343-44 (3d Cir. 2009).  To determine when hearsay evidence is admissible, we have developed a balancing test that "consider[s] both the reliability of the proffered hearsay and the cause why a witness is not produced." *Id.* at 344.  Although we generally review a district court's application of that test for abuse of discretion, if the district court "made no attempt to conduct the analysis" we review the admissibility of hearsay evidence *de novo*. *Id.*  Here, the District Court denied Hicks's objections and admitted all of the government's evidence, without any stated analysis of the defendant's right to confrontation.[7]  We therefore review the admissibility of the contested evidence *de novo*.

_____

[7] The District Court's discussion of its evidentiary rulings was as follows:

> I think this is a different kind of a proceeding.  It's not unlike
> where the government may bring a criminal charge and at the
> same time bring a civil charge for a violation of someone's
> civil rights where the basic charge is the same.  I think maybe

7

Under the *Lloyd* balancing test, the government must typically "provide good cause for a hearsay declarant's absence" in order to justify denial of a defendant's right to confrontation. *Id.* at 345. *Lloyd* rejected, however, "a *per se* rule that a district court's failure to explicitly address cause amounts to reversible error in all cases." *Id.* Rather, we recognized that "[i]n some cases, the [defendant's] interest in confrontation may be overwhelmed by the hearsay's reliability such that the government need not show cause for a declarant's absence." *Id.* In determining whether that threshold is met, the relevant inquiry is whether the indicia of reliability rise to such a level that the defendant effectively has no legitimate interest in confronting the absent witness. *Id.* Indicia of reliability include whether the hearsay is "given under oath, replete with detail, or supported by corroborating evidence." *Id.* (citations omitted). On the other hand, hearsay is unreliable when it "reflect[s] an adversarial relationship with the accused or contain[s] multiple layers of hearsay." *Id.* (citations omitted).

During her revocation hearing, Hicks made a blanket objection to "all … statements that elicit hearsay," which the District Court denied. (App. at 170.) On appeal, she reiterates that generalized objection, but specifically challenges the admissibility of only two categories of out-of-court statements, both of which she also specifically objected to during the hearing. Namely, she objects to statements made by a

---

that analogy would apply here. So I'm going to consider any evidence with respect to alleged violations in Tennessee.

(App. at 168-69.) While that statement is not perfectly akin to the erroneous assumption in *Lloyd* that "hearsay is categorically admissible in revocation proceedings," 566 F.3d at 344, it does not provide any analysis of why the hearsay here should be permitted.

8

Tennessee law enforcement officer and relayed by Secret Service Agent Earle regarding the search of the vehicle, and statements made by bank employees and others who were interviewed by Postal Inspector David Anderchak.[8] In denying Hicks's objections to testimony regarding those statements, the District Court did not consider whether there was cause for the declarants' absence, and the government did not suggest any possible causes prior to this appeal. Therefore, in order for the statements to have been properly admitted, they must be sufficiently reliable to "overwhelm" Hicks's interest in confronting the absent witness. *Lloyd*, 566 F.3d at 345. We turn, then, to whether each of the contested categories of statements meets that reliability threshold.

1. *Statements Relied on by Secret Service Agent Earle*

Hicks's objection to the evidence uncovered in the Tennessee incident hinges on Agent Earle's lack of "first-hand knowledge of Ms. Hicks' arrest and search of the car," and more specifically his lack of personal knowledge of the exact location in the car in which the incriminating documents were found. (Appellant's Opening Br. at 28; *see also id.* at 29-31 (describing the importance of the location of the documents); *id.* at 33 ("The

---

[8] Because of Hicks's blanket objection to all of the testimony regarding her alleged additional crimes, the government explains in its briefing why each piece of evidence it presented either is not hearsay or is reliable under *Lloyd*. We do not conduct the same comprehensive analysis because Hicks does not actually discuss the admissibility of most of the evidence that Agent Earle and Inspector Anderchak presented. For example, she raises no objection in her briefing (and made no specific objection at the revocation hearing) to the admissibility of the seized documents themselves. Despite the District Court's recognition of Hicks's "standing objection" to all of the evidence presented, we do not need to examine on appeal the admissibility of evidence that Hicks has never specifically challenged. *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived.")

agent could not state where [the documents] were in the car, where they were located in relation to the occupants or where they were among the personal belongings of the five occupants.").) Agent Earle learned of the seizure of the documents and of the circumstances of the search from his conversations with Detective Chad Ownby, the Tennessee Sheriff's Deputy who conducted the search, and from an affidavit made by the Detective on the day of Hicks's arrest. As the government concedes, Detective Ownby's affidavit and his statements to Agent Earle are hearsay, and thus they must meet the *Lloyd* requirements to have been properly admitted.

In *Lloyd*, we explained that evidence is generally reliable if it is "given under oath, replete with detail, or supported by corroborating evidence." 566 F.3d at 345 (citations omitted). Detective Ownby's affidavit has all of those indicia of reliability. First, it was given under oath, and Hicks suggests no reason to question Detective Ownby's truthfulness. *Cf. id.* (identifying an adversarial relationship between the declarant and the accused that called into question the reliability of the statements). Second, it is relatively detailed, including the specific types and numbers of documents discovered in the search of the car. Third, and most importantly, the affidavit is corroborated by substantial evidence. In statements she made directly to Agent Earle, Hicks herself corroborated that the documents were found in the car and that she possessed at least some of them.[9] (*See, e.g.*, App. at 185 (describing how Hicks claimed ownership of some of the documents).)

---

[9] To the extent that Hicks contests the admissibility of her statements to Agent Earle, they are statements by a party opponent and are thus excluded from the hearsay bar by Federal Rule of Evidence 801(d).

10

Moreover, the documents themselves provide powerful corroboration of Detective Ownby's suggestions in his affidavit that they were located in the car and possibly belonged to Hicks. Several of the credit cards and other identification cards seized in the search bore the same names as those on the tax refund checks that Hicks had deposited a few weeks earlier, and other seized documents were issued in names that Hicks had previously assumed. That corroborating evidence and the other indicia of reliability make Detective Ownby's affidavit highly reliable, such that Hicks has no significant interest in cross-examining him regarding the exact locations in which he found the documents.[10] *See Lloyd*, 566 F.3d at 345 ("In some cases, the [defendant's] interest in confrontation may be overwhelmed by the hearsay's reliability such that the government need not show cause for a declarant's absence.").

Detective Ownby's additional statements outside of his affidavit are similarly reliable. Based on his conversations with the Detective, Agent Earle testified that the majority of the seized cards were found in a "pink and orange wallet" located in a suitcase in the trunk filled with female clothing, and that the remainder of the documents were in a shoe box in the trunk. (App. at 182.) Hicks does not challenge the accuracy of that testimony, but rather argues that she should have had an opportunity to rebut its

___

[10] Hicks argues that the affidavit is unreliable because it "contain[s] multiple layers of hearsay." (Appellant's Opening Br. at 30.) Most of the affidavit consists of Detective Ownby's personal observations, which do not constitute hearsay within hearsay. Although some statements within it are based on Hicks's out-of-court statements to the Detective, (*see, e.g.*, App. at 234 (including statements such as "Ms. Hicks and Mr. Dutrieculle shared a piece of luggage," which is based on an earlier statement by Hicks)), those are also not hearsay because Hicks is a party opponent. Fed. R. Evid. 801(d). Thus, none of the parts of the affidavit relied on by Agent Earle contain multiple layers of hearsay.

11

implications through a cross-examination of Detective Ownby. Just as with the affidavit, however, that interest in confronting the declarant is overwhelmed by the reliability of the evidence. Although Detective Ownby's statements were not under oath, they are substantially corroborated by other evidence. Hicks discussed the pink and orange wallet and the shoe box of documents directly with Agent Earle, and she never disputes that they were found in the trunk of the car in which she was a passenger. Hicks has not pointed to any circumstances undermining the reliability of the statements, other than Agent Earle's lack of personal knowledge of the underlying facts. *See Lloyd*, 566 F.3d at 345 (describing potential indicia of unreliability). Detective Ownby's statements describing his search are, in sum, highly reliable, and Agent Earle's testimony regarding them was properly admitted.[11]

### 2. *Statements Relied on by Postal Inspector David Anderchak*

Hicks also objects to Postal Inspector David Anderchak's testimony regarding Hicks's alleged scheme to deposit other people's tax refund checks into her bank account. Specifically, Hicks maintains that the government should have presented as live

---

[11] Fundamentally, Hicks's objections to the evidence of the Tennessee incident relate more to its sufficiency than to its reliability. For example, she emphasizes that "[t]he documents and identification cards were not found on [her] person … or in an area of the car that was exclusive to her." (Appellant's Opening Br. at 29.) That assertion is indisputably true; no evidence – hearsay or otherwise – is to the contrary. That fact, however, does not make descriptions of where the evidence was found (namely, in a wallet in a suitcase and in a shoe box in the trunk of the car) inadmissible. Rather, as Hicks's attorney asserted during her cross-examination of Agent Earle, the fact that documents were found in the trunk leaves open the possibility that the documents belonged to one of the other people in the vehicle. Whether the evidence as a whole is persuasive enough to effectively rule out that possibility is a question of sufficiency, not of admissibility, and is addressed herein, *see infra* Part II.B.

witnesses the bank employees and the individuals whose refund checks Hicks tried to deposit, rather than only providing Inspector Anderchak's descriptions of his conversations with those individuals. The government responds that only a small part of Inspector Anderchak's testimony was actually hearsay, and that the rest of the evidence in the record corroborated those out-of-court statements such that they were reliable enough to be admissible.

We agree that all of the contested hearsay evidence is substantially corroborated by other evidence. The statements by bank employees consisted of an email summary of numerous checks that Hicks tried to deposit and a description of one particular incident in which Hicks and another woman attempted to cash a check made out to "Markeyla Tompkins," using fraudulent identification. The email summary is corroborated by the checks themselves and by surveillance photos showing Hicks at Citizens Bank attempting to deposit them. That evidence also corroborates the description of the Markeyla Tompkins impersonation, as does Hicks's own admission that she deposited Tompkins's check into her account. Furthermore, although the individuals whose tax refund checks Hicks deposited (or tried to deposit) were not presented as witnesses at the proceeding, Inspector Anderchak testified that they all denied that they had given Hicks permission to file tax returns on their behalf, which is supported inferentially by Hicks's own statement to Agent Earle that she did not file tax returns for those individuals. Given those substantial indicia of reliability, Inspector Anderchak's testimony was also properly admitted into evidence.

13

B.    *Sufficiency of the Evidence of the Supervised Release Violations*[12]

Hicks next claims that the evidence presented at the revocation proceeding was insufficient to establish her alleged violations. Although the District Court needed only to find by a preponderance of the evidence that she violated the conditions of her release, 18 U.S.C. § 3583(e)(3); *see also United States v. Maloney*, 513 F.3d 350, 354 (3d Cir. 2008), Hicks argues that the government has failed to meet even that lowered evidentiary burden for any of her three contested violations.[13] She claims that she was "factually in compliance" with the condition that she "refrain" from drug use because she complied with her substance abuse program and, under the circumstances, "relapse and treatment [were] to be expected." (Appellant's Opening Br. at 35.) With regard to the bar on associating with a person "engaged in criminal activity," she argues that the government has not established that she knew that Dutrieculle had a criminal record or that he was engaged in a criminal activity. (*Id.* at 36.) Finally, although Hicks concedes that "[t]he government presented many pieces of identification … as well as documents pertaining

---

[12] We review the District Court's decision to revoke supervised release for abuse of discretion. *United States v. Maloney*, 513 F.3d 350, 354 (3d Cir. 2008). Under that standard, "the factual findings supporting that decision are reviewed for clear error; legal issues are subject to *de novo* review." *Id.*

[13] As noted above, Hicks concedes, as she must, that she left the state without the permission of her probation officer. Although even one violation of her supervised release can sometimes be sufficient to justify revocation of supervised release, *see United States v. McCormick*, 54 F.3d 214, 219 n.3 (5th Cir. 1995) (concluding that if there is an "adequate basis" for revocation the reviewing court need not review the sufficiency of other contested grounds), the District Court did not place significant weight on that particular violation in reaching its decision. (*See* App. at 228-30 (emphasizing the Grade B violation and Hicks's new incidents of criminal conduct, and not mentioning her departure from the state).) It was not by itself the basis for revocation, and we thus assess the evidence of Hicks's other alleged violations.

to tax returns and banking," and that those documents "may appear [suspicious] as a group," she argues that the government failed to demonstrate her possession of the documents and thus did not establish by a preponderance of the evidence that she committed another crime. (*Id.* at 37.)

We disagree, and conclude that there is ample evidence to support each of Hicks's alleged violations. She cites no authority for her proposition that undergoing drug treatment is equivalent to actually "refrain[ing] from any unlawful use of a controlled substance," as she was required to do under the terms of her supervised release. (App. at 141-42.) As to Hicks's understanding of Dutrieculle's criminal activities, even if she had been unaware of his felony convictions, she knew he was "engaged in criminal activity" due to his role in the Tennessee incident. (*Id.*) Hicks herself told police that Dutrieculle was also in possession of the suitcase in which the identification cards were discovered, and she claimed that he was the owner of the cards. Dutrieculle also provided a false name when initially stopped. That evidence is sufficient for the District Court to conclude that he was likely engaged in criminal activity alongside Hicks and that she knew it.

The government has also produced substantial evidence that Hicks committed "another federal, state or local crime." (*Id.*) It is a violation of Tennessee law to knowingly possess a means of identification of another person without lawful authority and with the intent to commit an unlawful activity. Tenn. Code § 39-14-150(b). Sixty identification cards belonging to people other than Hicks were seized from a car in which Hicks was a passenger. She claimed partial ownership of the suitcase in which they were

15

discovered, she admitted to handling the cards, and several of the them bore the names of people whose checks she had deposited into her checking account two months earlier. That evidence is certainly sufficient to make it more likely than not that Hicks possessed the cards. Once possession is established, her intent to commit an unlawful activity is readily apparent. As Hicks admits, the sheer number of forms of identification found in the car was suspicious. Moreover, Hicks provided a false name at the time of her arrest, and she is an experienced identity thief. The District Court therefore cannot be said to have abused its discretion in finding by a preponderance of the evidence that Hicks committed another crime during her term of supervised release.[14]

C.      *Reasonableness of the Sentence*

Hicks argues that her sentence of 60 months' imprisonment, although "technically legal," is substantively unreasonable. (Appellant's Opening Br. at 43-45.) She claims that serving consecutive six-month sentences on each original count produces a total term of imprisonment that is greater than necessary.

When, as here, there is no procedural challenge to a district court's sentence, "we must give due deference to the district court's determination," and we will uphold the sentence "unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (internal quotation marks omitted). Here, the

---

[14] Even if there had been insufficient evidence of a violation of Tennessee law, the government produced substantial evidence that Hicks committed bank fraud, in violation of 18 U.S.C. § 1344, by depositing other people's tax refund checks.

District Court considered the totality of the circumstances and concluded that a total sentence of 60 months' imprisonment "afford[s] adequate deterrence to criminal conduct [and] protect[s] the public from further crimes of the defendant." (App. at 229.) In light of Hicks's dozens of prior convictions on similar charges, we cannot say that no reasonable sentencing court would have reached that conclusion.

D.    *Due Process Concerns*

Finally, Hicks claims that the overall evidentiary standard applied at the revocation hearing violated her due process rights.[15] That assertion is based on her contention that when a proceeding could result in a significant prison sentence, both due process and "fundamental fairness" require protections similar to those provided at a criminal trial. Specifically, Hicks argues that because she faced "a potential sentence of up to 20 years," she should have had the ability to confront her accusers, and the government should have had to prove beyond a reasonable doubt that she violated the terms of her supervised release. (Appellant's Opening Br. at 42.) In Hicks's view, by only imposing a "preponderance of the evidence" burden of proof and by allegedly denying her the right to confrontation, the District Court deprived her of her constitutional right to due process under the Fifth and Sixth Amendments to the United States Constitution.

Although Hicks is correct that "a parolee's liberty cannot be revoked without due process," *Lloyd*, 566 F.3d at 343, she disregards clear precedent defining the scope of that

---

[15] We have plenary review over Hicks's due process claims. *See United States v. Dees*, 467 F.3d 847, 854 (3d Cir. 2006) (exercising plenary review over a criminal defendant's Fifth and Sixth Amendment challenges to his sentence).

protection.  In *Morrissey v. Brewer*, the Supreme Court held that a defendant in a parole revocation proceeding does not enjoy "the full panoply of rights" due a criminal defendant.  408 U.S. at 480.  That diminished protection is justified by the government's "overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial if in fact he has failed to abide by the conditions of his parole."  *Id.* at 483.  Accordingly, we have concluded that a violation of supervised release may be established "by a preponderance of the evidence standard rather than a reasonable doubt standard," *Dees*, 467 F.3d at 854, and we have identified a "limited right to confrontation" of witnesses that can be "overwhelmed" when evidence is sufficiently reliable, *Lloyd*, 566 F.3d at 343, 345.  Hicks thus received all the process she was due, and the District Court did not err in revoking her supervised release and re-imprisoning her on her original counts of conviction.

## III.   Conclusion

For the forgoing reasons, we will affirm the revocation of supervised release and the sentence imposed by the District Court.